POLAROID CORPORATION v. MURIEL K. OFFERMAN, Secretary of Revenue of the State of North Carolina

No. 70PA98

(Filed 4 December 1998)

**1. Taxation § 114 (NCI4th)— corporate income tax—patent infringement damages—test for business or nonbusiness income**

The Court of Appeals erred by reversing a trial court's summary judgment for the North Carolina Secretary of Revenue in an action to determine the North Carolina tax classification of monies Polaroid received from a patent infringement suit against Kodak. The definition of business income under the North Carolina Corporate Income Tax Act includes the functional test, based upon canons of statutory construction, pertinent administrative rules, and the legislative history surrounding the Act and the UDITPA, the uniform act upon which the North Carolina act was based. N.C.G.S. § 105-130.4(a)(1).

**2. Taxation § 114 (NCI4th)— damages from patent infringement action—lost profits—functional test—business income**

The award of lost profits to Polaroid in a patent infringement lawsuit against Kodak constituted business income under the North Carolina Corporate Income Tax Act pursuant to the functional test even though the income was obtained as a result of court proceedings rather than marketplace sales. Once a corporation's assets are found to constitute an integral part of the corporation's regular trade or business, income resulting from the acquisition, management, and/or disposition of those assets constitutes business income regardless of how that income is received. Since the Kodak judgment constitutes income "in lieu of" profits Polaroid ordinarily would have obtained in the marketplace, the "lost profits" award fits squarely within the functional test for the definition of business income.

**3. Taxation § 114 (NCI4th)— patent infringement—reasonable royalties—in lieu of profits—business income**

Royalties received as a portion of a patent infringement judgment constitute business income under the functional test for purposes of North Carolina's Corporate Income Tax Act. In those

POLAROID CORP. v. OFFERMAN

[349 N.C. 290 (1998)]

situations where the patentee decides to keep a close monopoly and not grant licenses, the "reasonable royalty" measure in reality represents lost profits and therefore constitutes business income because it is income received in lieu of profits that would constitute business income and be taxable as such absent the infringement.

**4. Taxation § 114 (NCI4th)— patent infringement—prejudgment and post-judgment interest—business income**

Interest received by Polaroid as a result of a patent infringement judgment against Kodak constitutes business income under the North Carolina Corporate Income Tax Act. Although Polaroid argues that the interest could not consist of income "in lieu of" that which it would have earned absent the infringement because it would not have allowed its normal business accounts to be overdue long enough to produce this amount of interest, the interest portion of the judgment was "in lieu of " interest which it otherwise would have received from its own investments. Classifying the interest portion of the judgment as business income fits squarely within the "in lieu of" formula of apportioning damages.

**5. Constitutional Law § 157 (NCI4th)— judgment in patent infringement suit from another state—business income in North Carolina—no due process or commerce clause violation**

North Carolina acted within its constitutional rights by classifying Polaroid's patent infringement judgment against Kodak as business income and taxing it accordingly.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 128 N.C. App. 422, 496 S.E.2d 399 (1998), reversing an order entered by Cashwell, J., on 28 February 1997 in Superior Court, Wake County, and remanding for entry of summary judgment for plaintiff. Heard in the Supreme Court 12 October 1998.

*Alston & Bird, P.L.L.C., by Jasper L. Cummings, Jr., for plaintiff-appellee.*

*Michael F. Easley, Attorney General, by Andrew A. Vanore, Jr., General Counsel; George W. Boylan, Special Deputy Attorney General; and Kay Linn Miller Hobart, Assistant Attorney General, for defendant-appellant.*

POLAROID CORP. v. OFFERMAN

[349 N.C. 290 (1998)]

*Multistate Tax Commission, by Paull Mines, General Counsel, amicus curiae.*

WYNN, Justice.

Plaintiff Polaroid Corporation ("Polaroid"), a Massachusetts corporation, develops, manufactures, and sells photographic equipment. As one of the world's predominant manufacturers of instant photographic equipment, Polaroid continually develops and refines methods of designing and marketing those products. Under this market-leading approach, Polaroid has obtained an extraordinary number of patents; however, it has never licensed its core technology to an unrelated third party.

In 1976, Polaroid sued Eastman Kodak Company ("Kodak") under 35 U.S.C. § 271(a) to enjoin Kodak's alleged infringement of Polaroid's patents and to recover damages caused thereby. Approximately nine years thereafter, the United States District Court for the District of Massachusetts ruled for Polaroid, enjoined Kodak, and reserved the issue of damages for later determination. *See Polaroid Corp. v. Eastman Kodak Co.*, 641 F. Supp. 828 (D. Mass. 1985), *aff'd*, 789 F.2d 1556 (Fed. Cir.), *cert. denied*, 479 U.S. 850, 93 L. Ed. 2d 114 (1986).

Following a hearing in 1990, that federal district court resolved the damages issue by determining lost profits to be the primary measure of damages and, as required under 35 U.S.C. § 284, by using the alternative "reasonable royalty" measure to set a floor below which the damages could not fall. *See Polaroid Corp. v. Eastman Kodak Co.*, 17 U.S.P.Q.2d 1711 (D. Mass. 1991). Accordingly, the final order awarded Polaroid damages of $233,055,432 for "lost profits," an additional $204,467,854 for "lost profits" determined on the basis of a "reasonable royalty," and prejudgment interest in the amount of $435,635,685.[1]

As stated, the Kodak lawsuit did not occur in North Carolina. None of Polaroid's property or personnel relating to the Kodak lawsuit were located in this state, nor were any of the infringed-upon patents utilized by Kodak. Moreover, Polaroid did not utilize the judgment proceeds in the regular course of its business in North Carolina. Indeed, the record indicates that Polaroid used the proceeds to pay

---

1. Polaroid ultimately collected $924,526,554, the difference constituting additional postjudgment interest.

income taxes, repay debt, redeem both preferred and common stock, and provide its employees with a special bonus.

In 1991, Polaroid classified the Kodak judgment for North Carolina corporate income-tax purposes as "nonbusiness income" under N.C.G.S. § 105-130.4(a)(1). Hence, Polaroid allocated the entire judgment to Massachusetts, the state of its commercial domicile. The North Carolina Department of Revenue, however, disagreed with Polaroid's classification of the award as nonbusiness income and therefore reclassified it as business income. This reclassification, in turn, increased Polaroid's North Carolina tax liability by $499,177. After Polaroid objected to the reclassification of the award as business income, an administrative hearing was held before the Secretary of Revenue, who upheld the Department of Revenue's decision. Thereafter, Polaroid tendered the requisite amount and filed this refund action under N.C.G.S. § 105-241.4.

The parties filed motions for summary judgment which were heard at the 9 December 1996 Civil Session of the Superior Court, Wake County, before the Honorable Narley L. Cashwell. Judge Cashwell, on 28 February 1997, granted the Secretary of Revenue's motion and denied Polaroid's. Thereafter, Polaroid appealed to the Court of Appeals, which reversed the trial court's decision and remanded to the trial court for summary judgment for Polaroid. See *Polaroid Corp. v. Offerman*, 128 N.C. App. 422, 496 S.E.2d 399 (1998).

On 2 April 1998, this Court granted the Secretary of Revenue's petition for discretionary review to decide whether the damages Polaroid received as a result of the Kodak lawsuit constitute business income under N.C.G.S. § 105-130.4(a)(1).

## I. BACKGROUND

[1] North Carolina is one of seventeen states which comprise the associate membership of the Multistate Tax Commission, an administrative agency of the Multistate Tax Compact ("Compact").[2] The Compact was created to promote uniformity and compatibility in significant components of state tax systems and to avoid duplicative taxation. *In re Appeal of Chief Indus.*, 255 Kan. 640, 652, 875 P.2d 278, 286 (1994). One of the Commission's central goals is to promote

2. There are currently twenty-one full-member states of the Multistate Tax Commission. Member states differ from associate-member states in that member states have enacted legislation making the Compact a part of their statutory law. Associate states, on the other hand, though expressing a commitment to the Commission's goals, have not incorporated the Compact into their statutory law.

POLAROID CORP. v. OFFERMAN

[349 N.C. 290 (1998)]

uniformity in the states' taxation of interstate and foreign commerce. Additionally, uniformity among the states with respect to taxation of interstate and foreign commerce constitutes the basis behind the Compact's almost word-for-word incorporation of the Uniform Division of Income for Tax Purposes Act, 7A U.L.A. 331 (1985) ("UDITPA"). So, given North Carolina's commitment to the Compact and its goal of achieving uniform taxation nationwide, it is not surprising that this state's Corporate Income Tax Act is modeled after UDITPA. *See* N.C.G.S. § 105-130.4 (1989); *National Serv. Indus. v. Powers,* 98 N.C. App. 504, 391 S.E.2d 509, *appeal dismissed and disc. rev. denied,* 327 N.C. 431, 395 S.E.2d 685 (1990).

Under both the North Carolina Corporate Income Tax Act and UDITPA, a multistate or multinational corporation's net taxable income is divided into two classes: (1) business income which is apportioned among the Compact taxing states according to a three-part formula based upon property, payroll, and sales factors, N.C.G.S. § 105-130.4(i); and (2) nonbusiness income which is allocated in a manner whereby it is taxed only by the state with which the asset that generated the income is most closely associated, N.C.G.S. § 105-130.4(h). *See National Serv. Indus.,* 98 N.C. App. at 506-07, 391 S.E.2d at 511.

Thus, at the threshold, a taxpayer must identify and segregate its "business" income from its "nonbusiness" income. Section 105-130.4(a)(1) of the North Carolina Corporate Income Tax Act defines business income as

> income arising from transactions and activity in the regular course of the corporation's trade or business and includes income from tangible and intangible property if the acquisition, management, and/or disposition of the property constitute integral parts of the corporation's regular trade or business operations.[3]

Nonbusiness income, on the other hand, is defined as "all income other than business income." N.C.G.S. § 105-130.4(a)(5).

In the case *sub judice,* the parties disagree over the proper construction of the statutory definition of business income.

---

3. North Carolina's definition of business income is slightly broader than the definition found under the Uniform Act. Specifically, North Carolina's definition reads "acquisition, management, and/or disposition of the property," as opposed to the definition in UDITPA, which uses the conjunction "and" rather than "and/or." Moreover, North Carolina's definition utilizes the term "corporation" instead of "taxpayer." These distinctions are irrelevant to the case *sub judice.*

**POLAROID CORP. v. OFFERMAN**

[349 N.C. 290 (1998)]

Unquestionably, the first clause of N.C.G.S. § 105-130.4(a)(1) and UDITPA—which provides that business income is "income arising from transactions and activity in the regular course of the corporation's trade or business"—sets forth the "transactional test." Under the transactional test, to determine whether business income is derived from a transaction or activity in the regular course of the corporation's trade or business, one must consider the frequency and regularity of similar transactions, the former practices of the business, and the taxpayer's subsequent use of the income. *See National Serv. Indus.*, 98 N.C. App. at 508-09, 391 S.E.2d at 512; *Ross-Araco Corp. v. Commissioner of Bd. of Fin. & Revenue*, 544 Pa. 74, 76, 674 A.2d 691, 693 (1996); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 92 (Tenn. 1993). Therefore, the central inquiry under the transactional test revolves around the nature of the particular transaction giving rise to the income. *See Union Carbide Corp.*, 854 S.W.2d at 92.

With respect to the statutory definition's second clause—which provides that business income "includes income from tangible and intangible property if the acquisition, management, and/or disposition of the property constitute integral parts of the corporation's regular trade or business operations"—the parties debate whether this clause simply modifies the first clause or whether it sets forth a second, independent test for business income.

Some state supreme courts read the second clause of UDITPA as simply modifying the first clause and therefore hold that the definition of business income under UDITPA contains only the transactional test. *See, e.g., Phillips Petroleum Co. v. Iowa Dep't of Revenue & Fin.*, 511 N.W.2d 608 (Iowa 1993); *In re Appeal of Chief Indus.*, 255 Kan. 640, 875 P.2d 278; *Federated Stores Realty v. Huddleston*, 852 S.W.2d 206 (Tenn. 1992). However, after these decisions, the legislatures of those states promptly amended their respective tax statutes to explicitly include the functional test within their definition of business income. *See* Act of May 1, 1995, ch. 141, sec. 1, 1995 Iowa Acts 256, 256 (effective retroactive to 1 January 1995); Act of May 17, 1996, ch. 264, sec. 1, 1996 Kan. Sess. Laws 1868, 1868; Act of May 6, 1993, ch. 182, secs. 1, 2, 1993 Tenn. Pub. Acts 442, 442.

Other UDITPA states, however, recognized the second clause as encompassing a second independent test known as the "functional test." *See, e.g., Pledger v. Getty Oil Exploration Co.*, 309 Ark. 257, 831 S.W.2d 121 (1992); *Texaco-Cities Serv. Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 695 N.E.2d 481 (1998); *Simpson Timber Co. v. Department*

POLAROID CORP. v. OFFERMAN

[349 N.C. 290 (1998)]

*of Revenue*, 326 Or. 370, 953 P.2d 366 (1998); *Ross-Araco Corp. v. Commissioner of Bd. of Fin. & Revenue*, 544 Pa. 74, 674 A.2d 691. These states concluded either that the plain language of UDITPA includes the functional test or that the definition of business income is ambiguous, and therefore the respective state supreme courts had the right to construe the statute to include the functional test.

Under the functional test, income is classified as business income if it arises from the acquisition, management, and/or disposition of an asset that was used by the taxpayer in the regular course of business. *See Texaco-Cities*, 182 Ill. 2d at 268, 695 N.E.2d at 484. When determining whether a source of income constitutes business income under the functional test, the extraordinary nature or infrequency of the event is irrelevant. *Id.*

In the instant case, we are called upon to determine whether the second clause of N.C.G.S. § 105-130.4(a)(1) should be construed as modifying the first clause, thereby mandating that business income include only those transactions that occur in the regular course of the corporation's business, or whether the second clause encompasses the independent functional test, thereby allowing extraordinary transactions to constitute business income so long as the relevant asset was used by the corporation in the regular course of business. This determination is of particular import in this case because Polaroid's recovery from the Kodak lawsuit constitutes an extraordinary or unusual transaction which provided Polaroid with income from assets—the patents—which are integral parts of its regular trade or business operations.

We note that *National Serv. Indus.*, 98 N.C. App. 504, 391 S.E.2d 509, is the only North Carolina case addressing the "business income" issue. In that case, our Court of Appeals was asked to decide whether income obtained from "safe-harbor leases" of electric-generating equipment constituted business income when the taxpayer was not in the business of generating, leasing, or selling electricity or electrical equipment. *Id.* at 508, 391 S.E.2d at 512. In finding that the income constituted business income under North Carolina's statutory definition, the Court of Appeals stated that the determinative question was "whether the return on [the taxpayer's] investment is an integral part of the [taxpayer's] trade or business." *Id.* The Court then concluded that since the lease arrangement was a means of gaining working capital and increasing cash flow for all of the taxpayer's business operations, it accordingly was an "integral part" of the taxpayer's business.

*Id.* The Court, however, failed to determine the threshold issue of whether this state's statutory definition of business income includes the functional test. We now address this issue of first impression—whether North Carolina's statutory definition of "business income" contains the functional test—by using the canons of statutory construction, pertinent administrative rules, and the legislative history surrounding both the Act itself and UDITPA.

## A. STATUTORY CONSTRUCTION

Under the canons of statutory construction, the cardinal principle is to ensure accomplishment of the legislative intent. *See L.C. Williams Oil Co. v. NAFCO Capital Corp.*, 130 N.C. App. 286, ——, 502 S.E.2d 415, 417 (1998). To that end, we must consider "the language of the statute . . . , the spirit of the act and what the act seeks to accomplish." *Coastal Ready-Mix Concrete Co. v. Board of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). Moreover, undefined words are accorded their plain meaning so long as it is reasonable to do so. *See Woodson v. Rowland*, 329 N.C. 330, 338, 407 S.E.2d 222, 227 (1991). Further, the Court will evaluate the statute as a whole and will not construe an individual section in a manner that renders another provision of the same statute meaningless. *See Williams v. Holsclaw*, 128 N.C. App. 205, 212, 495 S.E.2d 166, 170, *aff'd*, 349 N.C. 225, 504 S.E.2d 784 (1998). Significantly, in matters of statutory construction, an ambiguous tax statute shall be strictly construed against the state and in favor of the taxpayer. *See In re Appeal of Clayton-Marcus Co.*, 286 N.C. 215, 219, 210 S.E.2d 199, 202 (1974).

In this case, Polaroid contends, *inter alia*, that under N.C.G.S. § 105-130.4(a)(1), business income "arise[s] from transactions or activit[ies] in the regular course of the corporation's trade or business" and that the phrase "and includes" merely modifies this first clause by providing examples of what fits within the definition. The Secretary of Revenue, on the other hand, argues that the statutory definition of business income contains a compound predicate and thus encompasses both the transactional test and the functional test.

Under the preceding rules of statutory construction, we cannot agree with Polaroid's contention that the second clause of N.C.G.S. § 105-130.4(a)(1) simply modifies that section's first clause by providing examples of business income. First, grammatically speaking, business income constitutes the subject of the sentence, which is thereafter defined by two independent clauses, each with its own verb and subsequent definitional language. In fact, the statute could

POLAROID CORP. v. OFFERMAN

[349 N.C. 290 (1998)]

grammatically be read as stating: "Business income means income arising from transactions and activity in the regular course of the corporation's trade or business, and [business income] includes income from tangible and intangible property . . . ." That is, N.C.G.S. § 105-130.4(a)(1) does not contain a misplaced modifier, but rather utilizes a compound predicate to illustrate that "business income" includes the definitions set forth in both the first and second clauses. *See Kroger Co. v. Department of Revenue*, 284 Ill. App. 3d 473, 479, 673 N.E.2d 710, 713 (1996), *appeal denied*, 171 Ill. 2d 567, 677 N.E.2d 966 (1997).

Moreover, the General Assembly's decision to employ different language between the two clauses further demonstrates its intention of defining business income in a manner encompassing both the transactional test and the functional test. Indeed, the first clause states that business income can arise from "transactions or activity" in the "regular course" of the corporation's "trade or business." N.C.G.S. § 105-130.4(a)(1). The second clause, on the other hand, states that business income can arise from "property" which constitutes "integral parts" of the corporation's "trade or business operations." *Id.* Therefore, the triggering events in the first clause— "transactions or activities"—are replaced in the second phrase by the triggering events of "acquir[ing], manag[ing], and/or dispos[ing] of . . . property." Moreover, the predicate phrase found in the first clause—"in the regular course of the corporation's trade or business"—is replaced in the second clause with "integral parts of the corporation's regular trade or business operations." Accordingly, the second clause contains a definition distinct from that set forth in the first.

Our reading of N.C.G.S. § 105-130.4(a)(1) comports with that of other state supreme courts which have confronted this exact argument with respect to similarly worded statutes. For example, in *Texaco-Cities Serv. Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 695 N.E.2d 481, Texaco-Cities argued that income is business income only if it arises from transactions and activities occurring in the regular course of the taxpayer's business. The Supreme Court of Illinois, in rejecting this argument, stated:

The first clause consists of general language encompassing all activity in the "regular course of the taxpayer's trade or business." The second clause enlarges this definition to include income from property, as long as its "acquisition, management,

and disposition" constitute "integral parts of the taxpayer's regular trade or business operations."

*Id.* at 270, 695 N.E.2d at 485 (quoting 35 Ill. Comp. Stat. 5/1501(a)(1) (West 1994)). The court then concluded that the functional test was consistent with the plain language of the statute. *Id.*

Similarly, in *Simpson Timber Co. v. Department of Revenue,* 326 Or. 370, 953 P.2d 366, the Supreme Court of Oregon held that its definition of business income—also modeled after UDITPA—encompassed the functional test.[4] In *Simpson,* the Oregon court was asked to determine whether monies received by Simpson Timber as compensation for the federal government's condemnation of its timberland and timber constituted business income. *Id.* at 374, 953 P.2d at 368. Simpson Timber argued that because it did not voluntarily dispose of the property, the disposition could not constitute an integral part of its regular business operations. *Id.* at 375, 953 P.2d at 369. The Supreme Court of Oregon, in rejecting this argument, construed Oregon's definition of business income as including "[i]ncome from tangible and intangible property . . . 'if' the 'acquisition,' 'management,' 'use,' and 'disposition' of [it] are integral parts of taxpayer's regular business operations." *Id.* at 374, 953 P.2d at 369 (quoting Or. Rev. Stat. § 314.610(1) (1987)). The Oregon court concluded that since the timber and the land on which it was growing were assets admittedly acquired and used as integral parts of Simpson Timber's business, the income received from those assets, no matter how acquired, constituted business income. *Id.* at 376, 953 P.2d at 370.

New Mexico also applies an approach which, though utilizing the phrase "use test" instead of "functional test," appears to be consistent with our holding. *See Kewanee Indus. v. Reese,* 114 N.M. 784, 845 P.2d 1238 (1993). In *Kewanee,* the Supreme Court of New Mexico was asked to determine whether rental income received from dragline[5] leases constituted business income when the lessor was an oil and gas company which had no history of leasing or financing assets of

---

4. Oregon's definition of business income differs slightly from North Carolina's definition in that Oregon's definition refers to the "acquisition, the management, *use or rental,* and the disposition of property constitut[ing] integral parts of the taxpayer's regular trade or business operations." Or. Rev. Stat. § 314.610(1) (1987) (emphasis added). The addition of "use or rental" to the definition does not change the analysis with respect to whether the second clause of the definition constitutes an independent test for business income.

5. A dragline is a large piece of equipment used in the surface mining of hard minerals.

any kind. *Id.* at 786, 845 P.2d at 1240. The New Mexico court, in classifying the income as business income, defined the use test as an inquiry into whether the income received constituted a gain beyond mere appreciation from a passive investment. *Id.* at 789, 845 P.2d at 1243. Significantly, the New Mexico court cited a lower court's construction of section 72-15A-17(A) (now codified as N.M. Stat. Ann. § 7-4-2), defining business income as including income arising from " 'situations in which ". . . the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." ' " *Id.* at 788, 845 P.2d at 1242 (quoting *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue*, 88 N.M. 521, 522-23, 543 P.2d 489, 490-91 (Ct. App.), *cert. denied*, 89 N.M. 6, 546 P.2d 71 (1975)).

Lastly, we note that our holding is consistent with that of the Supreme Court of Pennsylvania, which found its definition of business income to encompass both the transactional and functional tests. *See Laurel Pipe Line Co. v. Commissioner of Bd. of Fin. & Revenue*, 537 Pa. 205, 642 A.2d 472 (1994). In *Laurel*, the Pennsylvania court partly analyzed the issue of whether its UDITPA-based definition of business income included the functional test by referring to other states' discussion on the issue. *Id.* at 208, 642 A.2d at 475. The Pennsylvania court concluded that the second clause of the definition sets forth an alternative and independent "functional" test by which earnings may be characterized as business income if the earnings arise from the acquisition, management, and disposition of property which constitutes integral parts of the taxpayer's regular trade or business. *Id.* Specifically, the court stated that under the functional test, the gain arising from the sale of an asset will be classified as business income if the asset produced business income while it was owned by the taxpayer. *Id.* at 210, 642 A.2d at 475.

In reaching a conclusion contrary to both this Court's and other state supreme courts' rulings, our Court of Appeals relied upon a 1917 probate case, *Miller v. Johnston*, 173 N.C. 62, 69, 91 S.E. 593, 597 (1917), wherein this Court interpreted the phrase "including the five front half-acre lots" in a manner such that the term "including" could not be construed as "in addition to." The Court of Appeals improperly relied upon this holding.

First, *Miller* involved discerning the intent of a devisee, not statutory construction. Moreover, this Court construed the modifying term "including," not the conjunctive phrase "and includes" at issue here.

Notably, subsequent to *Miller*, this Court stated that the word "includes," as set forth in this state's Turnpike Authority Act, indicates the General Assembly's intention to enlarge, not limit, the statutory definition. *See N.C. Turnpike Auth. v. Pine Island, Inc.*, 265 N.C. 109, 143 S.E.2d 319 (1965); *see also Baker v. Chavis*, 306 S.C. 203, 208-09, 410 S.E.2d 600, 603 (1991) (concluding that the phrase "shall include" indicates an intent to enlarge the statutory definition, not limit it). Therefore, we conclude that the Court of Appeals erroneously relied on our prior ruling in *Miller* when it determined that the phrase "and includes" cannot be read as meaning "in addition to."

Given our determination that the plain language of N.C.G.S. § 105-130.4(a)(1) encompasses both the transactional test and the functional test, we now focus upon the second clause's plain language to define the functional test. First, we note that the phrase "acquisition, management, and/or disposition" contemplates the indicia of owning corporate property. *See Texaco-Cities*, 182 Ill. 2d at 270, 695 N.E.2d at 485. Moreover, Webster's Dictionary defines "integral" as meaning "essential to completeness." *Merriam-Webster's Collegiate Dictionary* 607 (10th ed. 1993). Therefore, reading the second clause as a whole, business income includes income obtained from acquiring, managing, and/or disposing of property which is essential to the corporation's business operations.

In sum, both the general rules of statutory construction and the plain language of N.C.G.S. § 105-130.4(a)(1) lend support to the conclusion that this state's definition of business income for corporate income-tax purposes includes both the transactional test and the functional test. To hold otherwise would be to improperly read the conjunctive phrase "and includes" as the modifying term "including." Moreover, it would ignore general rules of grammar and syntax by displacing business income as the overriding subject for that section. *See Valentine v. Gill*, 223 N.C. 396, 398, 27 S.E.2d 2, 5 (1943) ("we need hardly go much further than the grammatical construction and syntax of the law to find its meaning").

## B. ADMINISTRATIVE RULE 17 NCAC 5C .0703

We find further support for our ruling in North Carolina Administrative Rule 17 NCAC 5C .0703. "The construction adopted by the administrators who execute and administer a law in question is one consideration where an issue of statutory construction arises." *John R. Sexton & Co. v. Justus*, 342 N.C. 374, 380, 464 S.E.2d 268, 271

(1995). This Court has said that such construction is "strongly persuasive" and therefore is entitled to "due consideration." *See Shealy v. Associated Transp., Inc.*, 252 N.C. 738, 742, 114 S.E.2d 702, 705 (1960). Indeed, "an interpretation by the Secretary of Revenue is *prima facie* correct. When the Secretary of Revenue interprets a law by adopting a rule or publishing a bulletin on the law, the interpretation is a protection to the officers and taxpayers affected by the interpretation." *In re Petition of Vanderbilt Univ.*, 252 N.C. 743, 747, 114 S.E.2d 655, 658 (1960); *see* N.C.G.S. § 105-264 (Supp. 1994).

Since the inception of the North Carolina Corporate Income Tax Act, the Secretary of Revenue has adopted the UDITPA approach of defining business income to include both the transactional test and the functional test. The UDITPA approach has been reflected in the Secretary of Revenue's administrative rules since 1976 and is currently set forth in North Carolina Administrative Rule 17 NCAC 5C .0703—labeled "Business and Nonbusiness Income"—which provides in pertinent part:

> The classification of income by the labels customarily given them, such as interest, rents, royalties, capital gains, is of no aid in determining whether that income is business or nonbusiness income. The gain or loss recognized on the sale of property, for example, may be business income or nonbusiness income depending upon the relation to the taxpayer's trade or business:
>
> . . . .
>
> (2) *A gain or loss from the sale, exchange or other disposition of real or personal property constitutes business income if the property while owned by the taxpayer was used to produce business income. . . .*
>
> . . . .
>
> (5) Patent and copyright royalties are business income if the patent or copyright was created or used as an integral part of a principal business activity of the taxpayer.

17 NCAC 5C .0703(2), (5) (June 1998) (emphasis added). The plain language of this rule clearly demonstrates the Secretary of Revenue's interpretation of business income as encompassing the functional test. Moreover, Polaroid has failed to produce sufficient evidence to rebut the presumption that the Secretary of Revenue's interpretation is *prima facie* correct. Therefore, we conclude that rule 17 NCAC 5C .0703 further supports our holding that business income, as defined

under the North Carolina Corporate Income Tax Act, includes the functional test.

Further, it is significant that the Secretary of Revenue's interpretation, as codified in rule 17 NCAC 5C .0703, has remained virtually unchanged for over twenty years. On the other hand, the General Assembly has revised the North Carolina Corporate Income Tax Act numerous times, and the specific statute at issue in the case *sub judice* has been amended six times. *See* Act of June 18, 1982, ch. 1212, 1981 N.C. Sess. Laws (Reg. Sess. 1982) 108, 108 (clarifying when a corporation may apportion part of its net income or net loss to another state); Act of Aug. 13, 1987, ch. 804, sec. 2, 1987 N.C. Sess. Laws 1695, 1695 (providing for apportionment of business income of an air or water transportation corporation); Act of June 27, 1988, ch. 994, sec. 1, 1987 N.C. Sess. Laws (Reg. Sess. 1988) 176, 176 (amending the formula used to apportion the income of multistate corporations to this state for income taxation and to conform the formula for payment of estimated taxes to the federal formula); Act of July 24, 1993, ch. 532, sec. 12, 1993 N.C. Sess. Laws 2239, 2264 (changing mandatory language to permissive); Act of June 29, 1995, ch. 350, sec. 3, 1995 N.C. Sess. Laws 828, 829 (making conforming changes to tax law in light of federal law preempting state regulation of most motor freight carriers); Act of Aug. 2, 1996, ch. 14, sec. 5, 1995 N.C. Sess. Laws (2d Extra Sess. 1996) 589, 592 (reforming unconstitutional tax provisions). We reiterate that the legislature is always presumed to act with full knowledge of prior and existing law and that where it chooses not to amend a statutory provision that has been interpreted in a specific way, we may assume that it is satisfied with that interpretation. *See State v. Benton*, 276 N.C. 641, 658-59, 174 S.E.2d 793, 804-05 (1970). We further reiterate that "long acquiescence in the practical interpretation of a statute is entitled to great weight in arriving at its meaning." *State v. Emery*, 224 N.C. 581, 587, 31 S.E.2d 858, 862 (1944). Thus, the absence of any pertinent amendment for so long a period, especially given the General Assembly's willingness to amend other provisions of the Corporate Income Tax Act, indicates legislative approval of the Secretary of Revenue's construction of the statute.

In summation, we conclude that the Secretary of Revenue's interpretation of business income as defined under N.C.G.S. § 105-130.4(a)(1) is entitled to due consideration and considered *prima facie* correct. This *prima facie* presumption is significant given Polaroid's failure to adequately rebut the Secretary of

Revenue's interpretation. Moreover, the General Assembly's failure to amend N.C.G.S. § 105-130.4(a)(1) demonstrates its implied acquiescence in the Secretary of Revenue's interpretation, thereby providing further support for our conclusion that the North Carolina Corporate Income Tax Act defines business income in a manner encompassing both the transactional and functional tests.

## C. LEGISLATIVE HISTORY

Additional support for our determination that North Carolina's definition of business income includes the functional test can be found in the legislative history surrounding both the North Carolina Corporate Income Tax Act and UDITPA. In determining the legislative intent behind North Carolina's Corporate Income Tax Act, this Court should consider not only the language utilized by the General Assembly, but also the history, spirit, and goals of the Act. *See Mark IV Beverage, Inc. v. Molson Breweries USA, Inc.*, 129 N.C. App. 476, 479, 500 S.E.2d 439, 442 (1998). Also, because it is well established that the North Carolina Corporate Income Tax Act was based upon UDITPA and prefaced upon meeting the goals of the Multistate Tax Compact, the policies underlying both UDITPA and the Compact lend a better understanding of the meaning behind North Carolina's Act.

UDITPA was designed to apportion among the states in which a multistate or multinational corporation does business the fair amount of net taxable business income earned by the corporation's activities in each state. *See Pledger*, 309 Ark. at 262, 831 S.W.2d at 124. UDITPA was needed because the divergence in state tax laws unfairly subjected multistate corporations to tax liability on greater than 100% of their income and debilitated their profit margins by increasing their compliance costs. *Id.* UDITPA was drafted to reduce this diversity and to therefore eliminate the accompanying overtaxation and high compliance costs associated with it.

We note that the uniform definition of business income, as set forth in UDITPA, finds its origins in early California jurisprudence. James H. Peters, *The Distinction Between Business Income and Nonbusiness Income*, 25 S. Cal. Tax Inst. 251, 272 (1973). Interestingly, the original draft of UDITPA failed to distinguish between business and nonbusiness income and was amended to reflect such a distinction only after the State of California suggested the value of such a distinction. *Id.* at 275. Ultimately, the uniform definition of business income was modeled after a proposed definition submitted by John Warren of California to the California State Tax Board in

February 1965. *Id.* In that letter, Mr. Warren discussed the allocation of royalty income and stated:

> [W]e felt the treatment of royalties was in conflict with the decisions of the State Board of Equalization . . . which had upheld formula apportionment of such income where the acquisition, management and disposition of the patents or copyrights constituted integral parts of the taxpayer's regular trade or business.

*Id.* The final draft of UDITPA encompasses this formula apportionment approach and thereby provides for the direct allocation of income only to the extent that such income is classified as nonbusiness income. *Id.; see also Texaco-Cities*, 182 Ill. 2d at 272, 695 N.E.2d at 486 (stating that the functional test was "adopted directly from the comment underlying the UDITPA").

Further, in *In re Appeal of Borden, Inc.*, Cal. St. Bd. of Equal., Cal. Tax Rep. (CCH) ¶ 205-616 (Feb. 3, 1997), the California Board of Equalization was faced with the question of whether the second prong of UDITPA contained the functional test. The Board determined that the uniform definition of business income encompassed the functional test and therefore held that "income from assets which are an integral part of the taxpayer's business is subject to apportionment by formula, regardless of whether the income may arise from an occasional or extraordinary transaction." *Id.* at 24, Cal. Tax Rep. (CCH) ¶ 205-616, at 14,897-59. In so ruling, the Board noted the recent rejections of the functional test by two other states but dismissed them as improper because those courts did not consider the fact that the uniform definition was derived from California jurisprudence and did not examine the uniform regulations interpreting the definition. *Id.* at 26, Cal. Tax Rep. (CCH) ¶ 205-616, at 14,897-59. Moreover, the Board noted that these decisions were in direct conflict with the Multistate Tax Commission's regulations. *Id.*

The preceding probe into the policies underlying the drafting of UDITPA convincingly shows that the UDITPA definition of business income encompasses the functional test. As stated, the North Carolina Corporate Income Tax Act was patterned after UDITPA. *See National Serv. Indus.*, 98 N.C. App. at 506, 391 S.E.2d at 511. Moreover, the timing of the adoption of the North Carolina Corporate Income Tax Act—effective 1 July 1967—illustrates that North Carolina was reacting to the nationwide trend of adopting legislation which increased the uniformity and compatibility of state income-tax laws with respect to interstate commerce. Therefore, we conclude

that North Carolina embraced both the uniform definition and the national trend and accordingly adopted the functional test as part of its definition of business income.

## II. APPLICATION

[2] Given our determination that the North Carolina Corporate Income Tax Act defines business income to include the functional test, we must now consider the question of whether Polaroid's award in the Kodak lawsuit constitutes business income under that test. As stated, Polaroid's damage award comprised three separate categories of relief: (1) $233,055,432 for "lost profits," (2) $204,467,854 for "lost profits" determined on the basis of a "reasonable royalty" as required under 35 U.S.C. § 284, and (3) $487,003,268 constituting prejudgment and postjudgment interest. We will address the classification of each category respectively.

## A. LOST PROFITS

It is undisputed that Polaroid's patents are an "integral part of its regular trade or business operations." Indeed, in its brief, Polaroid notes that Kodak's infringement constituted a "potentially devastating threat to the business of Polaroid" and that protection of Polaroid's patents was crucial to its ability to carry on its regular trade or business operations. Therefore, the patents can be characterized only as integral income-producing assets.

In the case *sub judice*, the question becomes whether income from these integral assets should be classified as nonbusiness income when that income is obtained as a result of court proceedings, rather than from marketplace sales. We hold that once a corporation's assets are found to constitute integral parts of the corporation's regular trade or business, income resulting from the acquisition, management, and/or disposition of those assets constitutes business income regardless of how that income is received.[6]

First, we note United States Supreme Court jurisprudence indicating that damages recovered by a patentee under 35 U.S.C. § 284 constitute compensation for any pecuniary loss suffered and are intended to return the patentee to the same condition in which it would have been had the infringement not occurred. See Aro Mfg. Co.

6. We do note, however, that cases involving liquidation are in a category by themselves. Indeed, true liquidation cases are inapplicable to these situations because the asset and transaction at issue are not in furtherance of the unitary business, but rather a means of cessation.

POLAROID CORP. v. OFFERMAN

[349 N.C. 290 (1998)]

*v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 12 L. Ed. 2d 457, 480 (1964). Indeed, the Supreme Court has explicitly stated that under the current statutory framework, an infringed-upon patentee can recover only its *damages*, as opposed to recovering profits obtained by the infringer or other monies punitive in nature. *Id.* at 506, 12 L. Ed. 2d at 480.

Using the aforementioned cases for general guidance, we now turn more specifically to two state supreme court cases outside of this jurisdiction which more directly guide us to our result. First, in *Simpson Timber*, the Supreme Court of Oregon was asked to determine whether condemnation proceeds resulting from a government taking of timberland and timber constituted business income. *Simpson Timber*, 326 Or. 370, 953 P.2d 366. The Oregon court, in classifying the proceeds as business income, first noted that the ultimate sources of the income were the standing timber and the land upon which it was growing—assets admittedly acquired and used as integral parts of the taxpayer's business. *Id.* at 376, 953 P.2d at 370. The court continued: "[W]hen the timber and land on which it was growing were disposed of by an involuntary sale to the government through condemnation, that disposition was as much an integral part of the taxpayer's regular business operations for purposes of the statutory definition as were the initial acquisition, management, and use of the timberland." *Id.* Thus, the court held that "[w]hether the conditions and terms of that sale were set by law, including constitutional law, does not alter that concept. Nor does it alter the additional fact that the compensation paid by the government for the timberland was compensation paid for property that the taxpayer intended to use to produce 'business income.'" *Id.* at 375, 953 P.2d at 369. Therefore, the court implicitly held that income received "in lieu of" prospective profits—income that would normally be characterized as business income—is considered business income for corporate income-tax purposes.

Similarly, in *Dover Corp. v. Department of Revenue*, 271 Ill. App. 3d 700, 648 N.E.2d 1089, *appeal denied*, 163 Ill. 2d 552, 657 N.E.2d 618 (1995), an Illinois appellate court held that a patent-infringement judgment representing reasonable royalties constituted business income under UDITPA. In so ruling, that court stated that "royalty income does not become nonbusiness income merely because Dover enforced its right to receive such income through litigation." *Id.* at 712, 648 N.E.2d at 1097. That is, the court determined that the patents themselves were integral assets used in Dover's regular trade or busi-

ness operations, and therefore any income obtained from the assets via the judgment constituted income "in lieu of" profits it normally would have received absent the infringement. Accordingly, since those profits would have been taxed as business income, any monies received "in lieu of" those profits should be taxed similarly.

We find the holdings in *Simpson Timber* and *Dover* persuasive. It is undisputed that the Kodak judgment was designed to compensate Polaroid for Kodak's infringement of its patents. Moreover, it is undisputed that Polaroid's patents were an integral part of its regular trade or business operations. In fact, Polaroid's primary source of income results from the sale of products based upon its patents. Therefore, given that the Kodak judgment constituted "income" stemming from the "acquisition, management, and/or disposition" of Polaroid's integral assets and in lieu of normal marketplace sales, we hold that it should be classified as business income for North Carolina corporate income-tax purposes.

Further, this Court is guided by United States Supreme Court precedent with respect to taxing litigation awards. In *United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88, 80 L. Ed. 500 (1936), the United States Supreme Court held that in patent-infringement cases, compensatory damages representing lost profits should be taxed in the same manner as if the profits were earned in the normal manner. Significantly, both statutory law and United States Supreme Court jurisprudence provide that patent-infringement damage awards are intended to put the infringed-upon party in the same pecuniary position as if the infringement had never occurred. *See* 35 U.S.C. § 284 (1981); *Aro Mfg. Co.*, 377 U.S. at 507, 12 L. Ed. 2d at 480. These damage awards implicitly provide infringed-upon parties with the profits they would have received from sales absent the infringement—profits which undeniably would have been taxable as business income. Since the Kodak judgment constitutes income "in lieu of" profits Polaroid ordinarily would have obtained in the marketplace, we hold that the "lost profits" award fits squarely within the functional test and this state's definition of business income.

### B. "REASONABLE ROYALTY"

[3] We now consider whether the portion of Polaroid's judgment which represents "reasonable royalties" constitutes business income under the functional test. As stated, Polaroid has never licensed out its patents to an unrelated third party, and accordingly, Polaroid has

**POLAROID CORP. v. OFFERMAN**

[349 N.C. 290 (1998)]

never received royalties as a percentage of its business income. Therefore, Polaroid argues that under the "in lieu of" approach set forth in the preceding section of this opinion, this Court cannot find that the "reasonable royalties" it recovered under the Kodak judgment constituted income "in lieu of" that which it would have received absent Kodak's infringement.

The Secretary of Revenue, on the other hand, argues that North Carolina Administrative Rule 17 NCAC 5C .0703(5) is directly on point. Under rule 17 NCAC 5C .0703(5), "[p]atent and copyright royalties are business income if the patent or copyright was created or used as an integral part of a principal business activity of the taxpayer." Therefore, the Secretary of Revenue argues that since there is no dispute that the patents at issue were created and used as integral parts of Polaroid's business, the amount Polaroid received as a reasonable royalty is properly classified as business income. Neither of these arguments guides our determination of this issue.

Instead, we consider the pertinent patent-law statute, 35 U.S.C. § 284. Under that statute, a party whose patent is found to be infringed upon is entitled to recover "*damages* adequate to compensate for the infringement, but in no event less than a *reasonable royalty* for the use made of the invention by the infringer, together with interest and costs as fixed by the court." (Emphasis added.) Significantly, section 284 contemplates a distinction between "damages" and "profits" recoverable in a patent-infringement suit: "In patent nomenclature, what the infringer makes is 'profits,' what the owner of the patent loses by such infringement is 'damages.' " *Duplate Corp. v. Triplex Safety Glass Co.*, 298 U.S. 448, 451, 80 L. Ed. 1274, 1278 (1936).

Prior to 1946, the statutory precursor to section 284, Rev. Stat. § 4921, allowed both damages and profits to be recovered. *See Aro Mfg. Co.*, 377 U.S. at 505, 12 L. Ed. 2d at 479. In 1946, however, Congress amended the statute to allow an infringed-upon patentee to recover only "damages." *See* 35 U.S.C. § 284; *Aro Mfg. Co.*, 377 U.S. at 505, 12 L. Ed. 2d at 479. The purpose of this change was to ensure that a patentee's recovery was limited only to those "damages" it suffered as a result of the infringement. *Aro Mfg. Co.*, 377 U.S. at 505, 12 L. Ed. 2d at 479. Indeed, prior to this amendment, a patentee could recover not only the damages it suffered as a result of the infringement, but also any *profits* made by the infringer so as to force the infringer to disgorge the fruits of the infringement. *See General*

*Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654, 76 L. Ed. 2d 211, 217 (1983). The patentee could recover those profits even if the infringement itself caused the patentee no harm. *Id.*

As stated, 35 U.S.C. § 284 allows the award of a reasonable royalty so long as the amount constitutes "damages" resulting from the infringement. *See Aro Mfg. Co.*, 377 U.S. at 505, 12 L. Ed. 2d at 479. These damages, in turn, are defined as constituting " 'compensation for the pecuniary loss [the patentee] has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts.' " *Id.* at 507, 12 L. Ed. 2d at 480 (quoting *Coupe v. Royer*, 155 U.S. 565, 582, 39 L. Ed. 263, 269 (1895)). Moreover, these damages "constitute 'the difference between [the patentee's] pecuniary condition after the infringement and what [its] condition would have been if the infringement had not occurred.' " *Id.* (quoting *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552, 29 L. Ed. 954, 960 (1886)). Thus, the pertinent question to be answered when determining damages is "how much had the Patent Holder . . . suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?" *Livesay Window Co. v. Livesay Indus.*, 251 F.2d 469, 471 (5th Cir. 1958).

The preceding rules used to determine damages in patent-infringement suits apply in two situations. In the first situation, the patentee exercises its patent rights by granting licenses to others, and the infringer is liable for damages because it acted without a license. *See Marvel Specialty Co. v. Bell Hosiery Mills, Inc.*, 386 F.2d 287, 290 (4th Cir. 1967), *cert. denied*, 390 U.S. 1030, 20 L. Ed. 2d 286 (1968). In this situation, the court will determine a reasonable royalty by inquiring into whether the patentee has established a fixed royalty. *Id.* If no fixed royalty has been established, the court will thereafter inquire into what constitutes a reasonable royalty given the facts presented. *Id.* The second situation involves those times when the patentee exercises its patent rights through a policy of not licensing out its patents and thereby maintains the patent and any accompanying invention as a close monopoly. *Id.* In this situation, there is no established royalty, and therefore the patentee's damages consist of "the money [the patentee] would have realized from a monopoly if there had been no infringement as, for example, the sales [the patentee] would have made and the profits [the patentee] would have realized, or what would have been a reasonable royalty had the patentee undertaken to grant licenses." *Id.* In either case, if the patentee can-

## POLAROID CORP. v. OFFERMAN

[349 N.C. 290 (1998)]

not prove its damages by a sufficient showing of lost profits or the establishment of a fixed royalty, the court must establish a reasonable royalty to provide the patentee with adequate compensation for the infringement. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

There are two established means of determining a reasonable royalty. The first requires an analysis into the infringer's own internal profit projections and motives. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898 (Fed. Cir.), *cert. denied*, 479 U.S. 852, 93 L. Ed. 2d 117 (1986). The second, more common, approach involves the construction of a hypothetical negotiation between a willing licensor and a willing licensee. *See Trilogy Communications, Inc. v. Comm Scope Co.*, 754 F. Supp. 468, 512 (W.D.N.C. 1990); *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 30 L. Ed. 2d 114 (1971). In either case, "the calculation is not a mere academic exercise in setting some percentage figure as a 'royalty.' The determination remains one of *damages* to the injured party." *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988). In reality, this device is a legal fiction designed to compensate when profits are not provable, partly because the patentee decided not to license its patents. *Id.* Moreover, it comports with the overarching goal of patent-infringement damage law to place the patent holder in as good a position as that in which it would have been absent the infringement. *See General Motors Corp.*, 461 U.S. at 655, 76 L. Ed. 2d at 217.

The preceding consideration of the pertinent patent-law statute and relevant case law convincingly demonstrates that the term "reasonable royalty," as set forth in 35 U.S.C. § 284, is a legal fiction used to help measure the damages an infringed-upon party is entitled to recover when that party is unable to produce satisfactory evidence of lost profits. Significantly, case law illustrates that "reasonable royalties" are used to return the patentee to the same pecuniary position it would have been in absent the infringement. Indeed, even a cursory reading of the trial court's damages opinion reveals that the trial judge based his "reasonable royalty" decision upon what he believed Polaroid would have earned absent Kodak's infringement. It follows that in those situations where the patentee decides to keep a close monopoly and not grant licenses, the "reasonable royalty" measure, in reality, represents lost profits. *See Marvel Specialty Co.*, 386 F.2d at 290. Therefore, in those situations where the patentee decides not

to license out its patents, we equate damages recovered under the label "reasonable royalties" with lost profits.

Given our determination that the reasonable royalties equate to lost profits, we accordingly reject Polaroid's argument that this aspect of its recovery cannot be assessed as income "in lieu of" lost profits. Moreover, because this part of the award does not, in reality, represent royalties, we reject the Secretary of Revenue's application of rule 17 NCAC 5C .0703(5). Rather, we hold that Polaroid's "reasonable royalty" recovery constitutes business income because it is income received "in lieu of" profits that, absent the infringement, would constitute business income and be taxable as such.

## C. PREJUDGMENT AND POSTJUDGMENT INTEREST

[4] Lastly, Polaroid contends that any interest it received as a result of the Kodak judgment does not constitute business income because it "would not have allowed its normal business accounts to be overdue long enough to produce over $450 million in interest." That is, the interest could not consist of income "in lieu of" that which would have been earned absent the infringement. Again, we find Polaroid's argument without merit.

According to the United States Supreme Court, a court determining damages in a patent-infringement lawsuit should ordinarily consider interest "to ensure that the patent holder is placed in as good a position as that in which he would have been had the infringer entered into a reasonable royalty agreement." *General Motors Corp.*, 461 U.S. at 655, 76 L. Ed. 2d at 217. Indeed, the United States Supreme Court has held that an award of prejudgment interest to a patentee was necessary to ensure full, complete, and adequate compensation since the patentee's damages consisted not only of the value of the lost royalty payments, but also of the foregone use of the money between the time of the infringement and the date of the judgment. *Id.*; *see also Waite v. United States*, 282 U.S. 508, 509, 75 L. Ed. 494, 495 (1931). Thus, United States Supreme Court jurisprudence demonstrates that an infringed-upon patentee's recovery of interest constitutes compensation for income it would have earned absent the infringement—income that would have been taxable as business income had it been obtained in the marketplace as opposed to the courtroom. Because the interest portion of the Kodak judgment constituted interest Polaroid received "in lieu of" that which it otherwise would have received from its own investments, classifying the inter-

est portion of the judgment as business income fits squarely within our "in lieu of" formula of apportioning damages.

We find further support for our conclusion in North Carolina Administrative Rule 17 NCAC 5C .0703(3). Under rule 17 NCAC 5C .0703(3):

> Interest income is business income if the intangible with respect to which the interest is received arises out of or was created by a business activity of the taxpayer and in those situations where the purpose for acquiring the intangible is directly related to the business activity of the taxpayer.

In this case, Polaroid's patents arose out of and were created by Polaroid's business activities. Further, Polaroid's purpose for acquiring the patents is undoubtedly related to its primary business activity of selling instant photographic equipment. Additionally, the interest income at issue arose out of the Kodak lawsuit and accompanying judgment. The interest represented income lost as a result of Polaroid's being unable to earn interest on the monies it should have received from sales absent the infringement. Thus, to the extent that the damage award constitutes prejudgment and postjudgment interest, it is properly characterized as business income.

With respect to Polaroid's argument that it would not have allowed that much interest to accrue in overdue accounts, we note that a decision to award interest in a patent-infringement lawsuit is in the trial court's discretion and will be set aside only if it constitutes an abuse of discretion. *See General Motors Corp.*, 461 U.S. at 657, 76 L. Ed. 2d at 219. Because Polaroid has failed to produce adequate evidence demonstrating that the trial court abused its discretion, we affirm the amount of the interest awarded.

## III. CONSTITUTIONALITY

[5] Finally, Polaroid argues that should we construe N.C.G.S. § 105-130.4(a) as including the functional test, then we must conclude that it violates the Due Process Clause of the United States Constitution by taxing income it has no power to tax and that it violates the Commerce Clause by overtaxing corporations doing business in interstate commerce. *See Allied-Signal, Inc. v. Director of Div. of Taxation*, 504 U.S. 768, 119 L. Ed. 2d 533 (1992) (holding a state may not constitutionally tax income unless it is attributable to "business activities" within the state). We find Polaroid's argument without merit.

**POLAROID CORP. v. OFFERMAN**

[349 N.C. 290 (1998)]

Under the United States Constitution, a corporation's "entire net income . . . generated by interstate as well as intrastate activities [can] be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 460, 3 L. Ed. 2d 421, 428 (1959). North Carolina has determined its fair taxable share utilizing a formula which examines the in-state aspects of a corporation's property, payroll, and sales. *See* N.C.G.S. § 105-130.4(i). Moreover, the apportionment formula utilized by North Carolina is the same one the Supreme Court found constitutional in *Butler Bros. v. McColgan*, 315 U.S. 501, 86 L. Ed. 991 (1942), and more recently cited with approval in *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 77 L. Ed. 2d 545 (1983).

Furthermore, to successfully challenge the constitutionality of a state's apportionment scheme, a taxpayer must demonstrate by "clear and cogent evidence" that the scheme results in extraterritorial values being taxed. *See Butler Bros.*, 315 U.S. at 507, 86 L. Ed. at 996. Polaroid has failed to provide such evidence.

Finally, North Carolina can constitutionally tax Polaroid's recovery from the Kodak lawsuit under the unitary business principle. According to the unitary business principle, a state may tax a corporation on an apportionable share of the multistate business carried on in part in the taxing state. *See Allied-Signal, Inc.*, 504 U.S. at 778, 119 L. Ed. 2d at 546. "In order to exclude certain income from the apportionment formula, the corporation must prove that the income was earned in the course of activities unrelated to those carried out in the taxing State." *Exxon Corp. v. Wisconsin Dep't of Revenue*, 447 U.S. 207, 223, 65 L. Ed. 2d 66, 81 (1980). For example, a state may include within a nondomiciliary corporation's apportionable income interest earned on deposits in a bank located outside of the state, if that income forms part of the corporation's working capital. *See Allied-Signal, Inc.*, 504 U.S. at 777-78, 119 L. Ed. 2d at 546-47.

In this case, Polaroid's judgment from the Kodak lawsuit constitutes income earned from activities related to North Carolina. The judgment partly represents profits which Polaroid would have earned absent Kodak's infringement. Those profits would have properly been considered apportionable income had they been earned in the normal manner. The fact that they were received in the courtroom instead of the marketplace is irrelevant. Moreover, the monies received from the Kodak lawsuit were used as part of Polaroid's working capital and

therefore constitute part of Polaroid's unitary business. Therefore, North Carolina acted within its constitutional rights by classifying the Kodak judgment as business income and taxing it accordingly.

## IV. CONCLUSION

We conclude that the definition of business income under the North Carolina Corporate Income Tax Act includes the functional test. This ruling is based upon canons of statutory construction, pertinent administrative rules, and the legislative history surrounding both the Act itself and UDITPA. Moreover, given that Polaroid's recovery constituted income in lieu of profits, that income should be classified as business income because it represents the disposition of assets integral to Polaroid's regular trade or business operations. Lastly, under United States Supreme Court jurisprudence, we conclude that subjecting Polaroid's recovery from the Kodak lawsuit to North Carolina income tax is constitutional under the unitary business principle.

REVERSED.