Midrex Techs., Inc. v. N.C. Dep't of Revenue, 2015 NCBC 88.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 13996

MIDREX TECHNOLOGIES, INC., )
          Petitioner, )
  )
     v. )
  )
N.C. DEPARTMENT OF REVENUE, )
          Respondent. )

**OPINION AND ORDER ON
PETITION FOR JUDICIAL REVIEW**

THIS MATTER is before the Court on the Petition for Judicial Review of a Final Agency Decision in this consolidated contested tax case pursuant to N.C. Gen. Stat. §§ 150B-43 (hereinafter, references to the General Statutes will be to "G.S."). On July 21, 2015, the Court held a hearing on the Petition for Judicial Review.

> *Robinson, Bradshaw & Hinson, P.A. by Thomas P. Holderness, Esq. for Petitioner Midrex Technologies, Inc.*

> *North Carolina Department of Justice by Tenisha S. Jacobs, Esq. for Respondent North Carolina Department of Revenue.*

McGuire, Judge.

## A. PROCEDURAL AND FACTUAL BACKGROUND.[1]

1. This matter involves a dispute between Petitioner Midrex Technologies, Inc. ("Midrex" or "Petitioner") and Respondent North Carolina Department of Revenue ("Department").[2] The issue before the Court is whether Petitioner is an "excluded corporation," as that term is defined in G.S. § 105-130.4(a)(4), and therefore entitled to apportion its in-state and out-of-state income using a single-factor apportionment formula,

---

[1] As Administrative Law Judge Croom recognized, the facts of this case are not in dispute. Accordingly, the Court recites the following undisputed facts.

[2] The parties have, at their own expense, scanned and sequentially Bates numbered the voluminous record in this matter, and have cited documents in the record by reference to their Bates number. The Court adopts this practice, but will also identify the document by name as it appears in the official record.

as opposed to the standard three-factor apportionment formula provided in G.S. § 105-130.4(i).[3]

2.      Articles 3 and 4 of the North Carolina Revenue Act ("Revenue Act"), G.S. § 105-1, *et. seq.*, impose a State franchise tax and corporate income tax, respectively.  While the State franchise tax is measured by "the total amount of [a corporation's] issued and outstanding capital stock, surplus and undivided profits" (collectively "Capital Stock Base"), G.S. § 105-122(b), the corporate income tax is levied on the State net income of a C-corporation.  G.S. § 105-130.3.  Notwithstanding these differences, when a corporation has income from sources both within and outside the State, it must determine the portion of its Capital Stock Base and State net income that is attributable to North Carolina.  *See* G.S. §§ 105-122(c)(1), 105-130.4, respectively.  In the context of tax law, this determination is commonly referred to as "allocation" and "apportionment."

3.      In North Carolina, a corporation having income from business activity which is taxable both within and without this State is required to allocate and apportion in accordance with the provisions contained in the Act.  To do so, a taxpayer must first determine which portion of the taxpayer's entire net income constitutes apportionable income.  G.S. § 105-130.4(a)(1) defines "apportionable income" as "all income that is apportionable under the United States Constitution." For the vast majority of corporations with business activities in and outside of North Carolina, apportionable income is calculated using a formula consisting of three factors: property, payroll and sales (collectively "Three-Factor Apportionment Formula").  G.S. §105-130.4(i).  Like many other states, however, North Carolina has enacted statutes providing specialized methods of apportionment for specific industries.  One such statute is G.S. §105-130.4(r), which authorizes single factor

---

[3] Excluded corporations apportion income based on sales only, while the standard three factor apportionment formula considers sales, property, and payroll.

apportionment for an excluded corporation. For purposes of the Act, an excluded corporation includes any corporation:

> [E]ngaged in business as a building or construction contractor, a securities dealer, or a loan company or a corporation that receives more than fifty percent (50%) of its ordinary gross income from intangible property.

G.S. §105-130.4(a)(4).

Midrex's Business

4. Midrex is a corporation with its headquarters in Charlotte, North Carolina. Midrex developed a process to convert iron ore into direct reduced iron ("DRI"), a premium iron that could be used as a feed for making steel ("Midrex Process"). The Midrex Process requires the construction of a specialized plant to create DRI ("Midrex Plant"). Midrex sells Midrex Plants, which can require multiple years to design and build and cost hundreds of millions of dollars.[4] A Midrex Plant requires a vertical shaft furnace positioned in a large structural steel tower approximately 300 to 400 feet tall, a reformer, compressors, material handling equipment, water treatment equipment, and utility distribution equipment for air, water, and electricity.

5. During the tax years at issue in this case, Midrex designed and sold Midrex Plants in Trinidad and Tobago, Russia, Malaysia, Pakistan, Argentina, Oman, the United States, Saudi Arabia, and Qatar. The sale of a Midrex Plant includes a number of components and services. To provide these services, and to ultimately deliver a Midrex Plant, Midrex operates in three primary business segments: (a) Engineering Services and Procurement Services; (b) Midrex Plant Sales; and (c) After Market Sales.[5]

---

[4] As noted by the ALJ, in 1983, Midrex was acquired by Kobe Steel, Ltd. ("Kobe") and, as a result of that acquisition, Kobe became the owner of the patents and proprietary rights associated with the Midrex Process. Midrex was granted a license to use the Midrex Process, as were two other companies, Siemens VAI and SMS Siemag. *See* Final Decision, p. 2 ¶ 4.

[5] After-Market Sales involves the provision of additional equipment and parts to an existing Midrex Plant and is not at issue in this proceeding.

6.     Midrex's engineering services play a significant, if not primary, role in the construction and operation of a Midrex Plant. This work involves designing the various equipment and structures that compose the Midrex Plant. This design work can take one to two years and is largely performed at Midrex's headquarters by Midrex employees holding job titles such as "Refractory Specialists," "Equipment Specialists," "Mechanical Engineers," and "Mechanical Designers." During this stage, Midrex also provides to its clients procurement and logistical services relating to the acquisition and transportation of equipment for Midrex Plants.

The Plant Sales Contract

7.     Midrex enters into written contracts for the sale of a Midrex Plant.[6] The contract to design and manufacture a Midrex Plant generally consists of two separate agreements: a "Purchase of Equipment and Services" agreement, and a "Technical Field Advisory Services" agreement (hereinafter, these agreements will be referred to collectively as the "Plant Sale Contract"). The Plant Sale Contracts include technical specifications for the Midrex Plant, payment terms, and warranty provisions. These contracts also detail the scope of work to be performed by each party to the contract.

8.     Under these Plant Sale Contracts, a party other than Midrex, usually the client purchasing the Midrex Plant, bears the responsibility for the actual physical erection and installation of the Midrex Plant. The client generally is required to supply the raw materials and utilities, hire the necessary labor, and provide overall coordination of the project. The Purchase of Equipment and Services agreement contains various provisions regarding the respective scopes of work being undertaken by Midrex and its client. This agreement states

---

[6] *See* Nu-Iron Unlimited Plant Sale Contract (OR 919-53). In their briefing the parties have used the contract between Midrex and Nu-Iron for the construction of a Midrex Plant at Point Lisas, Trinidad & Tobago falls as illustrative of such contracts. Accordingly, the Court will use the provisions of this contract for purposes of its discussion herein.

that "[Midrex] will provide those engineering services for the Project as specifically set forth in Section 21 – Scope Matrix" and "will provide the Equipment as specifically set forth in Section 21 – Scope Matrix."[7] The Purchase of Equipment and Services agreement states that "Nu-Iron will provide certain basic and detailed engineering, equipment and materials, and construction of all equipment and materials for the Project generally as listed in Section 21 – Scope Matrix" and "[w]ith the exception of the Equipment and engineering to be provided by [Midrex] pursuant to this agreement, Nu-Iron will engineer, provide, erect and assemble all equipment and materials that are required for the complete operating Plant."[8] This agreement also provides that the "Client will provide overall coordination of the project, including construction schedule control, selection and/or administration of firms and civil design, civil works, PLANT erection, and design and installation of infrastructure required to make a complete, functional plant."[9]

9.      Midrex's responsibilities with respect to the advisory services include providing technical advice regarding the erection and fabrication of, and installation of equipment in, the Midrex Plant.[10] The Technical Field Advisory Services agreement states that "MIDREX will provide specific technical advise (*sic*) during the PLANT construction primarily as it relates to the process, beginning with the civil works, and including all erection and fabrication at the PLANT SITE of the EQUIPMENT and materials."[11] The agreement provides that Midrex's field advisory services include "interpretation and explanation of drawings . . . specifications and other technical data, "advice to the CLIENT or his CONTRACTOR(S) in developing and updating a construction sequence for the orderly

---

[7] *Id.* (OR 921).
[8] *Id.*
[9] *Id.* (OR 928).
[10] *Id.*
[11] *Id.* (OR 950).

assembly and erection of the PLANT," and "field inspection of the material, equipment, and workmanship."[12] The Technical Field Advisory Services agreement also places responsibility on Midrex for commissioning and start-up of the Midrex Plant.[13] The Technical Field Advisory Services agreement reiterates that ultimate responsibility for supervision of all work performed remains on the client.[14]

10. The "Section 21 – Scope Matrix" lists hundreds of individual tasks and processes associated with designing, constructing, and commissioning the Midrex Plant, and assigns responsibility for each task. As one would expect, the vast majority of tasks assigned to Midrex fall under engineering and erection advice, particularly with regard to installation of plant equipment.[15] On the other hand, the client maintains responsibility for virtually all "erection execution" tasks.[16]

11. A number of Midrex personnel are on-site during the construction of a Midrex Plant. Among the personnel typically sent to perform field work are erection managers, production managers, lead operations managers, mechanical supervisors, mechanical operations coordinators, material coordinators, piping supervisors, and others.[17] Once on site, these individuals assist the general contractor, who was retained by the owner, in scheduling and sequencing construction, determining manpower requirements, providing quality control, directing and supervising the installation of Midrex's equipment, and supervising the initial operation of the plant.[18] Midrex's personnel draft progress reports for the project,[19]

---

[12] Nu-Iron Unlimited Plant Sale Contract (OR 950).
[13] *Id.* (OR 950-52).
[14] *Id.* (OR 950).
[15] *Id.* (OR 932-47).
[16] *Id.*
[17] Carter Aff. (June 2, 2014) 2-3 (OR 219-20).
[18] *Id.*
[19] *Id.* Ex. C (OR 236-37).

obtain local work permits in certain cases,[20] and are tasked with supervising various vendors.[21]

12. While most of Midrex's on-site field work consists of advice and direction, on some occasions Midrex employees and engineers provide hands-on labor in connection with the erection and construction of Midrex Plants. The hands-on work could include, *inter alia*, installation and re-wiring of electrical equipment, hauling mortar, and performing repairs and modifications to equipment in the Midrex Plant.[22] The record does not clearly reflect the frequency with which Midrex employees provided hands-on labor, the Department does not contest that, at least on some occasions, this type of work was performed.

13. It is undisputed that a client must contract with Midrex in order build a Midrex Plant because Midrex is the only company with the knowledge necessary for the design and construction of the plant.[23]

Midrex's 2005 – 2008 Tax Returns

14. For tax years 2005 through 2007, Midrex filed its tax returns with North Carolina as a 100% domestic corporation, and did not apportion its State franchise or corporate income tax between North Carolina and out-of-state activities. In 2008, after receiving advice from KPMG, Midrex filed a 2008 return in which it apportioned its State franchise and corporate income tax between in-state and out-of-state activities using the standard Three-Factor Apportionment Formula. At the time it filed its 2008 State return, Midrex also amended its 2005-07 returns to use the Three-Factor Apportionment Formula.

---

[20] Collins Dep. 60.
[21] Nu-Iron Vendor Field Services Agreement (OR 446).
[22] *See* Petitioner's Br. Supp. PJR 9-10.
[23] Carter Aff. (June 2, 2014) 2 (OR 219).

On each of Midrex's State tax returns during the Period at Issue, Midrex used a NAICS code associated with engineering, and not construction, services.[24]

15.     Subsequently, Midrex amended its State returns for the tax years 2005 - 2008 to re-compute Midrex's tax liability using the single factor apportionment formula applicable to excluded corporations. Midrex based this amendment on the determination, aided by KPMG, that Midrex was engaged in business as a building or construction contractor. On this basis, Midrex submitted the refund claim at issue in this case.[25]

16.     On August 30, 2013, the Department issued a Notice of Final Determination ("Final Determination") in which the Department denied Midrex's claim for a refund of North Carolina corporate income and franchise taxes for tax years 2005 through 2008. On October 25, 2013, Midrex initiated a contested case proceeding in the Office of Administrative Hearings ("OAH") challenging the Final Determination and contending that Midrex qualified as an excluded corporation during the tax years at issue. On July 7, 2014, the parties appeared before Administrative Law Judge Craig Croom (the "ALJ") on cross-motions for summary judgment.

17.     On October 10, 2014, the ALJ issued his Final Decision and Order in which he granted Respondent's Motion for Summary Judgment ("Final Decision"). In doing so, the ALJ concluded that Midrex was not entitled to a refund of State corporate income and franchise taxes because "it was not engaged in business as a building or construction contractor and is

---

[24] As will be discussed in greater detail below, NAICS, or the North American Industry Classification System, is a standard used by statistical agencies in classifying business establishments based on their primary business activity. For its intended purpose and as maintained by the U.S. Census Bureau, a business is assigned only a single NAICS code.

[25] The parties have stipulated that if Midrex was an excluded corporation during the Period at Issue, it would be entitled to a refund in the amount of $3,303,736.00. Conversely, the parties also stipulated that if Midrex was not an excluded corporation, it would not be entitled to any refund of State corporate income and franchise taxes for the Period at Issue. Final Decision p. 7, ¶ 34.

therefore not entitled to utilize the single-factor apportionment methodology for excluded corporations set forth in G.S. § 105-130.4(r)."[26]

18.     On October 20, 2014, Midrex filed its Petition for Judicial Review of the Final Decision. In its petition, Midrex argues that the ALJ erred as a matter of law in his interpretation of G.S. § 105-130.4(a)(4) upon which he based the conclusion that Midrex was not an excluded corporation entitled to use single-factor apportionment.

## B.  ANALYSIS.

### Standard of Review

19.     "In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record." G.S. § 150B-51(c). In addressing asserted errors of law, unlawful procedure, or that the final decision exceeded the statutory, jurisdictional, or constitutional authority of the agency or administrative law judge, the Court is to apply the *de novo* standard of review. *Id.* "De novo review requires a court to consider a question anew, as if not considered or decided by the agency previously . . . ." *Smith v. Richmond Cnty. Bd. of Educ.*, 150 N.C. App. 291, 295, 563 S.E.2d 258, 263 (2002). Under this standard of review, the Court "freely substitutes its own judgment for the agency's." *N.C. Dept. of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 658, 599 S.E.2d 888, 895 (2004). Here, both parties agree that the proper standard of review in this matter is de novo.[27]

20.     Additionally, as the North Carolina Court of Appeals has recognized, "[o]ur legislature . . . specifically addressed review of a final agency decision granting summary judgment in" G.S. § 150B-51(d). *Krueger v. N.C. Crim. Justice Educ. & Training Standards Comm'n*, 198 N.C. App. 569, 576, 680 S.E.2d 216, 221 (2009). This section provides that:

---

[26] Final Decision and Order at 10.
[27] *See* Petition for Judicial Review ("PJR") ¶ 33; Resp't's Br. Opp. PJR 14.

> In reviewing a final decision allowing judgment on the pleadings or summary judgment, the court may enter any order allowed by G.S. [§] 1A-1, Rule 12(c) or Rule 56. If the order of the court does not fully adjudicate the case, the court shall remand the case to the administrative law judge for such further proceedings as are just.

G.S. § 150B-51(d).[28] Under Rule 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." G.S. § 1A-1, Rule 56(c). Under this standard, any inference of fact should be drawn against the movant. *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007).

21.    Accordingly, the Court reviews the Final Decision de novo, applying the summary judgment standard to determine whether there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.

22.    As noted above, the facts of this case are not in dispute. Instead, Midrex contends that the ALJ erred in his interpretation of G.S. § 105-130.4(a)(4) as applied to the undisputed facts of this case. Midrex contends that the ALJ improperly concluded that Midrex was not a "building or construction contractor."[29] Midrex also argues that the ALJ improperly construed the phrase "engaged in business" as requiring "a determination of a corporation's *primary* business activity."[30] Both contentions raise issues of statutory interpretation, which are questions of law for the Court. *Parkdale Am., LLC v. Hinton*, 200

---

[28] This section makes clear that the trial court, in reviewing a final decision granting summary judgment, is to consider the matter anew. Appellate decisions applying this section have found error where the trial court applied the whole record standard of review to determine whether the final decision was supported by substantial evidence. *See Krueger*, 198 N.C. App. at 576-77, 860 S.E.2d at 221. *See also York Oil Co. v. N.C. Dep't of Env't Health & Natural Res.*, 164 N.C. App. 550, 555, 596 S.E.2d 270, 273 (2004) (explaining that "[b]ecause the issue before the trial court was . . . whether summary judgment was properly granted, the correct standard of review remained de novo.").

[29] Petition for Judicial Review ¶ 38; Final Decision and Order, Conclusions of Law 20.

[30] Petition for Judicial Review ¶ 34; Final Decision and Order, Conclusions of Law ¶ 15 (emphasis added).

N.C. App. 275, 278, 684 S.E.2d 458, 461 (2009). Midrex contends that if the proper interpretation of G.S. § 105-130.4(a)(4) is applied to the undisputed facts, it falls within the definition of an "excluded corporation" for the tax years at issue.

23.     "[T]he first principle of statutory interpretation is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." *Id.* (internal citations omitted). As the North Carolina Supreme Court has noted,

> The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, 'the spirit of the act and what the act seeks to accomplish.' If the language of a statute is clear, the court must implement the statute according to the plain meaning of its terms so long as it is reasonable to do so.

*Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (internal citations omitted). "Under our canons of statutory interpretation, where the language of a statute is clear, the courts must give the statute its plain meaning." *North Carolina State Bar v. Brewer*, 183 N.C. App. 229, 236, 644 S.E.2d 573, 577 (2007) (internal citations omitted). "[U]ndefined words are accorded their plain meaning so long as it is reasonable." *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998).

24.     "A construction which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done without violence to the legislative language . . . ." *Elec. Supply Co. v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991). "An analysis of the plain language of the statute and the cannons of statutory construction must be done in a manner which harmonizes with the underlying reason and purpose of the statute." *Id.* A court should "avoid interpretations that create absurd or illogical results." *Ayers v. Bd. of Adjustment*, 113 N.C. App. 528, 531, 439 S.E.2d 199, 201 (1994).

25.     Special rules of construction apply where the statue at issue is one concerning taxation.  Accordingly, "[t]ax statutes are to be strictly construed against the State and in

favor of the taxpayer." *Wal-Mart Stores East, Inc. v. Hinton*, 197 N.C. App. 30, 42, 676 S.E.2d 634, 644 (2009) (internal citations omitted). "If a taxing statute is susceptible to two constructions, any uncertainty in the statute or legislative intent should be resolved in favor of the taxpayer." *Lenox, Inc.*, 353 N.C. at 664, 548 S.E.2d at 517.

26.     If a court determines that the statute is ambiguous, the interpretation made by the agency charged with enforcing the statute is relevant and should be considered by the reviewing court. *See Parkdale Am., LLC*, 200 N.C. App. at 81, 684 S.E.2d at 463 (recognizing that "one of the most significant aids to construction in determining the meaning of a revenue law is the interpretation given such act by the administrative agency charged with its enforcement. . . .") (internal citations omitted). In addition, the North Carolina Revenue Act expressly provides that "[a]n interpretation by the Secretary [of a tax statute] is prima facie correct." G.S. § 105-264(a).   Nevertheless, the weight or deference to be accorded to an agency's interpretation of a statute is not entirely clear under North Carolina law. Some appellate decisions provide that an agency's interpretation is to be given "great weight," *N.C. Dep't of Revenue v. Bill Davis Racing*, 201 N.C. App. 35, 51, 684 S.E.2d 914, 925 (2009), or "considerable weight," *Cnty. of Durham v. N.C. Dep't of Env't & Natural Res.*, 131 N.C. App. 395, 397, 507 S.E.2d 310, 312 (1998). Other decisions have rejected the notion that agency interpretations are entitled to deference under a de novo review. *Morris Commc'ns Corp. v. City of Bessemer*, 365 N.C. 152, 156, 712 S.E.2d 868, 871 (2011) (rejecting argument that city Board of Adjustment was entitled to deference in interpreting zoning ordinances and noting that "courts consider, but are not bound by, the interpretations of administrative agencies and boards.") (internal citations omitted). Some cases have even noted that a court should "defer to the agency's interpretation of a statute it administers 'so long as the agency's interpretation is reasonable and based on a permissible construction of the statute.' " *Cnty.*

*of Durham*, 131 N.C. App. at 397, 507 S.E.2d at 311 (quoting *Carpenter v. N.C. Dep't of Human Res.*, 107 N.C. App. 278, 279, 419 S.E.2d 582, 584 (1992)).

27. Ultimately, however, it is the Court's task to determine the meaning of the statutory provision at issue and where that meaning can be derived from the plain language of the statute, the agency's interpretation is irrelevant. *Parkdale Am., LLC*, 200 N.C. App. at 281, 684 S.E.2d at 463 (quoting *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 202-03, 675 S.E.2d 641, 650 (2009)). Accordingly, the Court will now turn to the interpretation of G.S. § 105.130.4(a)(4) and will first address the terms used in the statute have a plain meaning.

"Building or Construction Contractor."

28. The Court must first determine the meaning of the term "building or construction contractor" as used in G.S. § 105-130.4(a)(4), and then whether the work performed by Petitioner in connection with the building and erection of a Midrex Plant qualifies as work as a building or construction contractor. Only if Midrex's work qualifies as building or construction contracting will the Court need to address the meaning of the statutory term "engaged in business."

29. Midrex argues that the services it provides under the Technical Field Advisory Services agreement qualify as a type of construction management, which generally is accepted to be part of "construction contracting." The Department appears to concede that Midrex performs some services that could qualify as construction management. Nonetheless, the Department contends that since Midrex's contracts do not place responsibility on Midrex to build or erect the plant, and because Midrex is not significantly involved in the physical labor of building the plant, it is not a building or construction contractor.

30. Articles 3 and 4 of the Revenue Act and the provision related to the apportionment of a corporation's income and franchise taxes do not contain an express definition of "building or construction contractor." Accordingly, the Court must determine if

that term has a plain meaning. *See Polaroid Corp. v. Offerman*, 349 N.C. at 297, 507 S.E.2d at 290 (recognizing that in interpreting a statute, "undefined words are accorded their plain meaning so long as it is reasonable"). To guide the Court in this inquiry, North Carolina courts have long explained that "[d]ictionaries are properly used to ascertain the 'plain meaning' or the 'natural and ordinary meaning' of words used in a statute." *In re LaRue*, 113 N.C. App. 807, 810, 440 S.E.2d 301, 303 (1994) (internal citations omitted). Moreover, "[d]efinitions of the word or term contained in other statutes, although not controlling 'throw some light upon . . . [its] normal usage.' " *Id.* (internal citations omitted).

31.     As an initial matter, it is important to note what the plain language of this section does not require. This section does not require that a taxpayer be a licensed general contractor to qualify as an excluded corporation. As our court of appeals has recognized, "[n]ot every person who undertakes to do construction work . . . is a general contractor . . . ." *Mill-Power Supply Co. v. CVM Assocs.*, 85 N.C. App. 455, 461, 355 S.E.2d 245, 249 (1987) (interpreting the meaning of "general contractor" as used in G.S. § 87-1). Accordingly, whether Petitioner is a licensed general contractor in this, or any other, jurisdiction where it performs its field work is not determinative of the issue before the Court.

32.     In addition, the plain language of the statute does not exclude subcontractors from being "building or construction contractors," and the parties do not seem to dispute that subcontractors could qualify as excluded corporations under the statute. *See Mill-Power Supply Co.*, 85 N.C. App. at 461, 355 S.E.2d at 249.

33.     Turning to what the plain language of this section does require, the Court firsts considers the dictionary definition of the terms building, construction and contractor.[31]

---

[31] The statute is written in the disjunctive "building or construction contractor," leading to the conclusion that building contractor and a construction contractor might be engaged in somewhat different work, and that the separate definitions of "building" and "construction" must be considered.

Merriam-Webster defines "building" as "the art or business of assembling materials into a structure" and "construction" as "the process, art, or manner of constructing something." A contractor is defined as "one that contracts or is a party to a contract: as (a) one that contracts to perform work or provide supplies[; or] (b) one that contracts to erect buildings."

34.     Another source for determining the plain meaning of statutory language is the definition given to the same language in a different North Carolina statute.  The Court is able to find only one other use of the terms "building contractor" or "construction contractor" in this State's statutes.  In the Machinery Act, North Carolina has defined "construction contractor" as a "taxpayer who is regularly engaged in building, installing, repairing, or improving real property." G.S. § 105-273(5a). This statutory definition is consistent with the dictionary definitions and emphasizes the physical work of "building" and "installing" as the critical elements of construction contracting, and does not suggest that it excludes subcontractors or other contractors.  On the other hand, nothing about this definition suggests that it includes businesses not engaged in the physical building, erection, or assembling of a structure.  This definition, although not controlling, "throw[s] some light upon [that term's] usage." *In re LaRue*, 113 N.C. App. 807, 811, 440 S.E.2d 301, 303 (1994).

35.     The Department contends that the United States Court of Appeals for the Third Circuit has held that the "fixed popular meaning of building contractor is 'one who contracts with the owner to become his builder, to erect his structure according to certain plans and for a certain compensation.'" *Desco Prods. Caribbean v. Gov. of V.I.*, 511 F.2d 1157, 1159 (3d Cir. 1975) (quoting *Wilson v. District of Columbia*, 26 App. D.C. 110, 113 (D.C. Cir. 1905)). Comparing this definition to North Carolina's statutory definition, the statutory provisions encompasses a broader range of activity. First, the term at issue here is "building *or construction* contractor", not solely the narrower term "building contractor."  In addition, the *Desco* definition of "building contractor" appears to apply only to those who directly

contract with the owner to build "his structure", implying it would apply only to a general contractors, and would exclude subcontractors or other trade contractors that do not directly contract with the owner. The Department does not contend that subcontractors or other types of indirect contractors could not fall under the North Carolina statutory definition of an excluded corporation. The Court is not persuaded that the *Desco* definition reflects the plain meaning of the term "building or construction contractor." Instead, the dictionary and statutory definitions noted above appear to more accurately reflect the common understanding of that phrase, as they include a broader range of activity, including subcontracting and other trade work.

36. Midrex argues that construction contracting can include work in the nature of project management and supervision typically performed by general contractors, and that its field advisory work qualifies as construction management. Midrex notes that NAICS, upon which the Department relies in support of its interpretation of "engaged in business," recognizes that "[c]onstruction managers that provide *oversight and scheduling only (i.e., agency)* as well as construction managers that are responsible for the entire project (i.e., at risk) are included as general contractor type establishments."[32] The NAICS recognition, however, occurs in the context of a description of the type of contracting in which an establishment is "primarily engaged." In other words, the NAICS recognizes that where an establishment's primary business is providing oversight and scheduling for construction projects it may properly be classified for purposes of the NAICS system as a "general contractor-type establishment." It does not suggest that any establishment which performs any amount of construction oversight and scheduling as some part of its services is a "building or construction contractor."

---

[32] *See* NAICS, Sector 23 – Construction (OR 781).

37.     Other construction industry sources also recognize construction oversight as a construction management "option."[33]   The North Carolina Construction Law Deskbook describes these types of companies as "agency" construction managers that perform the same management and coordination activities of a general contractor, but are not ultimately responsible for the success, or liable for the failure, of the project.[34]

38.     Inclusion of oversight and scheduling of construction projects as the work of a "building or construction contractor," however, is not supported by the common lay usage or plain meaning of that phrase, nor is it derived from usage of that phrase in other statutory provisions. Rather, "agency" construction management has a meaning derived from experience with the complex nature of various construction project delivery methods that is understood chiefly by those in the construction industry. Midrex does not contend, however, that the phrase "building or construction contractor," is a term or art or technical term such that the Court could consider technical interpretations or meanings unique to a specific industry. *See In re Appeal of Martin*, 286 N.C. 66, 77-78, 209 S.E.2d 766, 774 (1974) (noting that, in the absence of any evidence of technical meaning, the term "transship" was to be accorded its natural meaning). Accordingly, in the absence of evidence of the legislature's intent to incorporate any technical definition or terms of art into G.S. § 105-130.4(a)(4),[35] the Court's interpretation of that section is confined to the plain language of the statute.

---

[33] *See* NC Construction Law Deskbook § XV.II.C.

[34] *Id.* § XV.II.C.1. ("The agency or advisor type construction manager is retained by the owner as a professional advisor, manager, and coordinator. It is hired to supervise, as the owner's agent, the activities of the designer and contractor. Under this approach, the agency's construction manager acts as the owner's representative managing and coordinating the owner's contractors and consultants, but does not guarantee construction cost or time. The design professional and contractor may contract directly with the owner, or they may contract with the agency construction manager as the owner's agent.")

[35] As Midrex recognizes, the General Assembly has expressly referred to NAICS definitions into other statutes, thereby incorporating the technical meanings of those provisions contained in NAICS. Petitioner's Br. Supp. PJR 29. *See* G.S. § 105-129.2 (2009) (defining statutory terms by incorporating NAICS definitions).

39. When confined to the plain language, the Court concludes that construction management that involves only oversight or scheduling but does not include responsibility for performance or direction of the actual building, erection, or assembly of a structure does not fit within the plain meaning of the term "building or construction contractor" as used in G.S. § 105-130.4(a)(4).

40. Turning to the work performed by Petitioner, it is undisputed that Petitioner's field work was performed pursuant to written contractual agreements with the client-owner of the plant being constructed. The Purchase of Equipment and Services contract, however, provided only for engineering services and the sale of the equipment.[36] The client, and not Midrex, was responsible for providing the physical construction, installation, and erection of the Midrex Plant.[37] Midrex concedes that "[w]ere this the only contract between [Midrex and the client], [Midrex] might not have engaged in business as a construction contractor."[38] Midrex was not performing work as a "building or construction contractor" under this agreement.

41. Under the Technical Field Advisory Services agreement, Midrex's obligations were to "provide specific technical advise (*sic*) during the PLANT construction as it relates to the process, beginning with the civil works, and including erection and fabrication . . . ."[39] Petitioner was responsible for interpreting and explaining drawings and specifications, for advising the client in development of the construction sequence for the erection of the Midrex Plant, and for inspecting the material, equipment, and workmanship of the plant components.[40] The agreement does not expressly require Midrex to manage or direct any

---

[36] Nu-Iron Plant Sale Contract (OR 921).
[37] *See id.* (OR 923).
[38] Petitioner's Br. Supp. PJR 5.
[39] Nu-Iron Plant Sale Contract (OR 950).
[40] *Id.*

building, erection, or assembly work,[41] and it expressly provides that the client shall be responsible for supervision all work performed and that the client remains responsible for performing the erection and installation work.[42]

42.     The Technical Field Advisory Services agreement also obligated Midrex to direct and supervise the commissioning (start-up) of the Midrex Plant once it was constructed.[43] The commissioning itself, however, was to be "performed by the [Client's] trained management, operations and maintenance personnel".[44] While commissioning is required to deliver an operating Midrex Plant to the client, it is at best questionable whether the commissioning work can be considered part of the building or construction of the plant.

43.     Midrex admittedly did not contract to build, erect, or assemble the Midrex Plants.  Rather, Midrex contracted to provide engineering services to design the plant, sell the client proprietary and non-proprietary equipment, and to provide field personnel to advise the client during construction and start-up of the plant.  Based on the undisputed evidence, even strictly construing the statute in favor of the taxpayer, the Court concludes that Petitioner Midrex is not "a building or construction contractor," within the plain meaning of G.S. § 105-130.4(a)(4).

44.     Having concluded that Midrex's field work does not qualify as work "as a building or construction contractor" within the meaning of G.S. § 105-130.4(a)(4), it is unnecessary for the Court to address the parties' arguments regarding the meaning of the term "engaged in business."

---

[41] The Field Services Agreement provided that the work of certain "vendor field personnel will be coordinated and supervised by Midrex".  The agreement does not specify what type of work the vendor field personnel would be performing.
[42] Nu-Iron Plant Sale Contract (OR 950).
[43] *Id.* (OR 951-52).
[44] *Id.* (OR 951).

## C. CONCLUSION.

45.    Applying the plain language of G.S. § 105-130.4(a)(4), the Court concludes that Petitioner Midrex was not an excluded corporation during the tax years at issue. For the foregoing reasons, the Court AFFIRMS the Final Decision entered in this matter on October 10, 2014, and, pursuant to its authority under G.S. § 150B-51(d), DENIES Petitioner's Motion for Summary Judgment and GRANTS the Department's Motion for Summary Judgment.

SO ORDERED, this the 7th day of October, 2015.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
   for Complex Business Cases