IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-835

No. COA22-423

Filed 20 December 2022

Moore County, No. 21 CVD 108

VERONICA JANE DILLREE, by and through her General Guardian, EMILY TOBIAS, Plaintiff,

v.

HARRY DILLREE, and his Attorney-In-Fact, LISA WILCOX, Defendants.

Appeal by Defendants-Appellants from orders entered 1 November 2021 by Judge Warren McSweeney in Moore County District Court. Heard in the Court of Appeals 15 November 2022.

*Wilson, Reives, Silverman & Doran, PLLC, by Jonathan Silverman, for Plaintiff-Appellee.*

*Wyrick Robbins Yates & Ponton LLP, by Charles W. Clanton, K. Edward Greene, and Jessica B. Heffner, for Defendants-Appellants.*

INMAN, Judge.

¶ 1 This appeal presents an issue not previously decided by this Court: whether a general guardian has the power to cause a legal separation on behalf of an incompetent spouse for the purpose of bringing an equitable distribution claim. Construing our General Statutes and applying precedent from the divorce context, we hold a guardian is not so authorized.

## I.   FACTUAL & PROCEDURAL BACKGROUND

The record tends to show the following:

Defendant-Appellant Harry Dillree and Jane Dillree, originally college sweethearts in the 1950s, eventually married in the 1980s, after both had children from previous marriages. For decades, the Dillrees had a loving marriage: they shared common interests, golfed and travelled together, and were affectionate toward each other. The couple owned and lived in a home in Pinehurst, North Carolina, and Mr. Dillree retired early so he could spend more time with his wife.

### A.  Ms. Dillrees' Mental Decline and Guardianship Proceedings

In 2014, Ms. Dillree was diagnosed with Alzheimer's disease. As her condition deteriorated, Mr. Dillree stepped away from his hobbies to care for her. According to Mr. Dillree's adult daughter, Defendant-Appellant Laura Wilcox, the Dillrees' relationship remained loving during this time and neither of them indicated they wanted to leave the marriage. Ms. Wilcox never saw verbal or physical abuse or any other indication the two were unhappy.

However, in January 2017, one of Ms. Dillree's adult daughters, Susan Allen, observed Mr. Dillree making disparaging comments to Ms. Dillree because of her condition. On 19 January 2017, Ms. Dillree's other adult daughter, Valerie Hunter, filed with the Moore County Clerk of Superior Court a petition to declare Ms. Dillree incompetent. The petition, accompanied by a letter from Ms. Dillree's treating

physician, alleged that Mr. Dillree was incapable of providing his wife with proper care because he failed to administer her Alzheimer's medication, fed her once a day at most, and neglected to take her to medical appointments, in part because of his own cognitive decline. It further alleged that Mr. Dillree was verbally and physically abusive toward Ms. Dillree. The clerk appointed a guardian *ad litem* to investigate the allegations in the petition and to represent Ms. Dillree's interest in the proceeding. The guardian *ad litem* visited the Dillrees' home that afternoon, spoke with both Mr. and Ms. Dillree, and filed an affidavit with the clerk reporting her observations.

¶ 6        The next day, on the pretense of taking them out for lunch, Ms. Hunter drove the Dillrees to the Moore County Courthouse to appear for a hearing on the motion. The clerk adjudicated Ms. Dillree incompetent and appointed Plaintiff-Appellee Emily Tobias as the interim guardian of Ms. Dillree's person and estate. Ms. Tobias took custody of Ms. Dillree immediately following the hearing.

¶ 7        Ms. Dillree was initially hospitalized and then transferred to a care facility to ensure her well-being and to keep her physically separate from Mr. Dillree. Ms. Tobias determined the separation was necessary, in part, because Ms. Dillree did not have the capacity to consent to sex with her husband but expressed that she enjoyed sexual activity with him. By the end of the month, Ms. Tobias had Ms. Dillree

transferred to Penick Village, an assisted living facility with a memory care unit in Pinehurst. The Dillrees have lived apart since then.

¶ 8    In March 2017, the trial court appointed Ms. Tobias as her general guardian. The order found that Ms. Dillree's "medical and mental condition requires more care, attention, and safety control than her 80-year-old husband is capable of providing without professional assistance," that the Dillrees "have substantial financial assets, but it is not in the best interests of [Ms. Dillree] to dissolve all of her assets for division into a Guardianship account," and that the general guardian shall approve visitation schedules for Mr. Dillree with Ms. Dillree at Penick Village in accord with her "best interests" and "wishes." Ms. Dillree has not been restored to competency, and she has remained at Penick Village.

## B. Mr. Dillree's Mental Decline

¶ 9    Mr. Dillree became distraught after his wife's removal from their marital home, and his mental condition deteriorated. Ms. Tobias allowed Mr. Dillree limited visits with his wife for one to two hours at a time despite his requests to spend the day with her. Mr. Dillree's behavior made Penick Village staff and visitors uncomfortable, and he threatened to harm staff if they did not let him see his wife. He was then prohibited from the facility. In April 2018, after Mr. Dillree told his neuropsychologist about a plan to kidnap his wife from Penick Village, he was

involuntarily committed to a psychiatric facility and a petition was filed by Penick Village staff to have him declared incompetent.

¶ 10        In exchange for dismissal of the involuntary commitment and incompetency proceedings, Ms. Wilcox moved her father to a care facility in Libertyville, Illinois where she lives. Mr. Dillree has since then been diagnosed with Alzheimer's disease, and Ms. Wilcox was appointed his guardian to represent his interests in this litigation. Mr. Dillree, through counsel, requested that Ms. Dillree be moved to the same facility or area so that they could be together or near each other. Ms. Tobias did not respond. In January 2019, and again in November 2019, counsel for Mr. Dillree filed motions to alter the guardianship and to have Ms. Dillree moved to Illinois. The trial court denied each of those motions.

## C. Disputes Regarding Mr. Dillree's Financial Support of Ms. Dillree

¶ 11        The parties disagree about Mr. Dillree's financial support of his wife and her care since she was removed from their home.

¶ 12        In the four years between January 2017 and January 2021, Ms. Tobias had received a total of $1,090,803 for Ms. Dillree's benefit from various sources, including approximately $7,000 per month in proceeds from a long-term care insurance policy.

¶ 13        Years before the Dillrees' cognitive decline, they had planned their estates together, with each being the beneficiary of the other's separate will and trust. But in July 2017, a few months after Ms. Dillree was deemed incompetent, Mr. Dillree

amended the Declaration of the Harry D. Dillree Trust to remove Ms. Dillree as the beneficiary and Ms. Allen, her daughter, as a co-trustee.

¶ 14        In August 2020, while preparing tax returns, Ms. Tobias learned of a Morgan Stanley account jointly owned by Mr. and Ms. Dillree worth over four million dollars. She asked Mr. Dillree's attorney to evenly divide and distribute funds in the account. One month later, the parties agreed via e-mail that Mr. Dillree would pay $15,000 per month for Ms. Dillree's 24-hour care as well as guardian fees then accrued in the amount of $77,000, and Ms. Tobias would not pursue distribution of funds from the joint brokerage account.

¶ 15        In addition to the jointly titled Morgan Stanley account, Ms. Dillree and Mr. Dillree each hold separate brokerage accounts in trust in values exceeding $8,000,000. Because of Mr. and Ms. Dillree's incapacity, their respective children are now successor trustees of their trusts. Ms. Tobias contends the brokerage accounts held by these trusts constitute marital and divisible property subject to equitable distribution. Since entry of the orders appealed from, the trial court has allowed joinder of the Harry D. Dillree Trust and the Veronica Jane Dillree Trust to this action.

**D. Equitable Distribution Proceeding**

¶ 16        In January 2021, four years after Ms. Dillree was adjudicated incompetent and removed from the marital home, Ms. Tobias filed a complaint on behalf of Ms. Dillree

against Mr. Dillree and his attorney-in-fact and daughter, Ms. Wilcox (collectively "Defendants-Appellants"), seeking, pursuant to N.C. Gen. Stat. §§ 50-20, 50-22 (2021), interim distribution of marital property, equitable distribution, and injunctive relief. The trial court entered a temporary restraining order ("TRO") to enjoin and restrain Defendants-Appellants from engaging in any conduct that would cause the disappearance, waste, or conversion of the Dillrees' joint Morgan Stanley brokerage account. One month later, the trial court entered orders continuing and modifying the TRO to allow Defendants-Appellants to spend funds necessary to care for Mr. Dillree.

¶ 17    In March 2021, Defendants-Appellants filed motions to dismiss the complaint pursuant to North Carolina Rules of Civil Procedure 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction, standing, and failure to state a claim upon which relief can be granted. Ms. Tobias, Ms. Allen, Ms. Wilcox, a staff member at Penick Village, and Nolan Hill, a close family friend, testified at the hearing on the motions. The trial court took the matter under advisement, and in November 2021 denied both motions to dismiss. Defendants-Appellants filed timely written notice of appeal.

## II.    ANALYSIS

### A. Appellate Jurisdiction

¶ 18    "Interim equitable distribution orders are by nature preliminary to entry of a final equitable distribution judgment and thus are interlocutory." *Hunter v. Hunter*,

126 N.C. App. 705, 707, 486 S.E.2d 244, 245 (1997) (citing *Veazey v. Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950)). Pursuant to our General Statutes, however, a party may appeal from an interlocutory order that affects a substantial right. N.C. Gen. Stat. § 7A-27(b)(3)a. (2021). "A substantial right is a legal right affecting or involving a matter of substance as distinguished from matters of form: a right materially affecting those interests which a man is entitled to have preserved and protected by law: a material right." *Estate of Redden v. Redden*, 179 N.C. App. 113, 116, 632 S.E.2d 794, 797 (2006) (citation and quotation marks omitted). "[T]he right itself must be substantial and the deprivation of that substantial right must potentially work injury to [appellant] if not corrected before appeal from final judgment." *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 726, 392 S.E.2d 735, 736 (1990) (citation omitted). The appellant has the burden to establish that a substantial right will be affected unless the appellant is allowed immediate appeal from an interlocutory order. *McConnell v. McConnell*, 151 N.C. App. 622, 625, 566 S.E.2d 801, 804 (2002).

¶ 19    Defendants-Appellants acknowledge their appeal is interlocutory in nature, but they allege the trial court's restraining orders and injunction affect a substantial right and work injury to them in several ways: (1) the orders deprive them of their right to freely manage and use the property in the joint brokerage account; (2) Plaintiff-Appellee's other pending motions for joinder of both spouses' trusts and

interim distribution would require Defendants-Appellants to pay and deplete assets in the fund; (3) the pending motion for attorney's fees would require a not insignificant payment; (4) payment of statutory guardian fees, up to five percent of assets, would constitute burdensome litigation costs; (5) the orders create the possibility of inconsistent verdicts; and (6) the orders interfere with Mr. Dillree's constitutional right to marry.

¶ 20        In the alternative, Defendants-Appellants request we exercise our discretion under Rule 2 of the North Carolina Rules of Appellate Procedure to reach the merits of this appeal. Rule 2 allows this Court to suspend its rules "[t]o prevent manifest injustice to a party, or to expedite decision in the public interest[.]" N.C. R. App. P. 2 (2022). Plaintiff-Appellee does not object to this Court reaching the issues presented in this interlocutory appeal to promote judicial economy and ensure an expeditious resolution of this case. Plaintiff-Appellee also notes the trial court certified this matter as affecting a substantial right pursuant to Section 7A-27(b)(3)a., but that certification does not appear in the record on appeal.

¶ 21        Because, as explained below, Defendants-Appellants' challenge to the trial court's subject matter jurisdiction is meritorious and our decision will result in final resolution of this matter and is in the public interest, we invoke Rule 2 to hear this appeal.

## B.  12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

¶ 22 Defendants-Appellants contend the trial court erred in denying their 12(b)(1) motion to dismiss for lack of subject matter jurisdiction because Mr. and Ms. Dillree never legally separated, and, if they did, Ms. Dillree's guardian did not have the authority to cause the separation. Our General Statutes and precedent support reversing the trial court's denial of Defendant's motion to dismiss on this ground.

### 1. *Standard of Review*

¶ 23 The plaintiff bears the burden of demonstrating subject matter jurisdiction. *Harper v. City of Asheville*, 160 N.C. App. 209, 217, 585 S.E.2d 240, 245 (2003). We review a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction *de novo*. *Morgan-McCoart v. Matchette*, 244 N.C. App. 643, 645, 781 S.E.2d 809, 811 (2016). On *de novo* review of a 12(b)(1) motion for lack of subject matter jurisdiction, this Court "considers the matter anew," including matters outside the pleadings, "and freely substitutes its own judgment for that of the trial court." *Bradford v. Bradford*, 279 N.C. App. 109, 2021-NCCOA-447, ¶ 9 (2021) (citation omitted). Statutory construction is also a question of law reviewed *de novo* on appeal. *Id.*

### 2. *Equitable Distribution & Separation Law*

¶ 24 A party may file an equitable distribution claim at any time after a husband and wife begin living separate and apart from each other. N.C. Gen. Stat. § 50-21(a) (2021). *See also id.* § 50-20(k) ("The rights of the parties to an equitable distribution of marital property and divisible property are a species of common ownership, the

rights of respective parties vesting at the time of the parties' separation."). A trial court does not have subject matter jurisdiction over an equitable distribution claim before the date of separation. *See Standridge v. Standridge*, 259 N.C. App. 834, 836-38, 817 S.E.2d 463, 465-66 (2018) (vacating an order for equitable distribution because both parties raised a claim for equitable distribution prior to the date of separation).

¶ 25    The same test employed to determine the date of separation in divorce proceedings applies in the equitable distribution context. *Hall v. Hall*, 88 N.C. App. 297, 299, 363 S.E.2d 189, 191 (1987). Separation "begins on the date the parties physically separate *with the requisite intention that the separation remain permanent*[.]" *Bruce v. Bruce*, 79 N.C. App. 579, 582, 339 S.E.2d 855, 858 (1986) (emphasis added). Living separate and apart "implies the living apart for such a period in such a manner that those in the neighborhood may see that the husband and wife are not living together." *Dudley v. Dudley*, 225 N.C. 83, 86, 33 S.E.2d 489, 491 (1945) (quotation marks and citations omitted). "When the parties objectively have held themselves out as man and wife and the evidence is not conflicting, we need not consider the subjective intent of the parties." *Schultz v. Schultz*, 107 N.C. App. 366, 373, 420 S.E.2d 186, 190 (1992). However, if the evidence is conflicting, the trial court must consider subjective intent. *See id.* at 372, 420 S.E.2d at 190; *Byers v. Byers*, 222 N.C. 298, 304, 22 S.E.2d 902, 906 (1942) ("There must be at least an intention on

the part of one of the parties to cease cohabitation, and this must be shown to have existed at the time alleged as the beginning of the separation period[.]").

> *a. At best, there is conflicting evidence of a public showing that the Dillrees were legally separated.*

Defendants-Appellants contend Finding of Fact 35, that "there has been a public showing of separation between the Dillrees" based on specified events occurring after Ms. Dillree was adjudicated incompetent, is unsupported by the evidence and amounts to legal error. Although Ms. Tobias had custody of Ms. Dillree's person as her guardian as of 20 January 2017 and ultimately removed Ms. Dillree from the marital home, Defendants-Appellants argue this physical separation did not establish a legal separation for the purposes of equitable distribution.

Though neither party addressed the nature of Finding 35 in their appellate briefs, at oral argument, counsel for Defendants-Appellants contended the determination that the parties held themselves out as separated is a conclusion of law, based on a summary of findings in the trial court's order. To the extent the trial court applied legal principles to the facts, its determination is a mixed question of law and fact, fully reviewable on appeal. *Hinton v. Hinton*, 250 N.C. App. 340, 347, 792 S.E.2d 202, 206 (2016).

Our Court has concluded that living under different roofs and ceasing sexual relations do not, absent other evidence, constitute a separation. *Lin v. Lin*, 108 N.C.

App. 772, 775-76, 425 S.E.2d 9, 10-11 (1993). Further, there is no separation "when the association between [spouses] has been of such character as to induce others who observe them to regard them as living together in the ordinary acceptation of that descriptive phrase." *In re Estate of Adamee,* 291 N.C. 386, 392, 230 S.E.2d 541, 546 (1976).

¶ 29 The trial court's order appointing Ms. Tobias as general guardian provided visitation for Mr. Dillree with Ms. Dillree at Penick Village in accordance with her "best interests" and "wishes." Ms. Tobias testified that she physically separated the Dillrees because Mr. Dillree could no longer provide proper care for Ms. Dillree and Ms. Dillree was unable to consent to sex as an incompetent person. No evidence in the record reflects that, prior to commencing this action, Ms. Tobias indicated the Dillrees were legally separated. Nolan Hill, a close friend of the couple, testified that Mr. Dillree became upset and sad when he could not visit his wife, and Mr. Hill did not understand the Dillrees to be legally separated.

¶ 30 Plaintiff-Appellee cites several other of the trial court's findings to support the conclusion that there has been a public showing of the Dillrees' separation. She enumerates the following examples listed in Finding 35: (1) Mr. Dillree changed his estate plans; (2) counsel negotiated Ms. Dillree's financial support; and (3) the "proceedings between Mr. Dillree and those acting on Ms. Dillree's behalf" were adversarial in nature. It is not apparent from the record that any member of the

public, including those in the Dillrees' community, knew this information, much less that either Mr. or Ms. Dillree brought it to anyone else's attention. Plaintiff-Appellee has cited no legal authority to support the trial court's determination based on the evidence of record.

¶ 31        Because, at best, there is conflicting evidence about whether the Dillrees objectively held themselves out as legally separated while they were physically separated as a result of their guardianships and medical conditions, we must consider the subjective intent of the parties. *See Schultz*, 107 N.C. App. at 372, 420 S.E.2d at 190.

> b. *A guardian may not substitute subjective intent for an incompetent spouse and cause a separation for purposes of equitable distribution.*

¶ 32        Defendants-Appellants argue: (1) there is no evidence Ms. Dillree formed the subjective intent to permanently separate from Mr. Dillree before she was adjudicated incompetent; and (2) Ms. Tobias, as Ms. Dillree's guardian, does not have the statutory authority to cause a marital separation for the purposes of equitable distribution on behalf of Ms. Dillree. Construing our General Statutes together and applying our precedent, we agree.

¶ 33        Ms. Tobias testified that she physically separated the Dillrees because Mr. Dillree could no longer provide proper care for Ms. Dillree and because she could not consent to sexual activity: "[Mr. Dillree]'s behavior was such that we needed to keep

her safe. . . Issues developed from the interim hearing where she was unable to give consent and she didn't recognize him, and so we had to keep him physically separate from her as far as a marital sexual nature." Staff from Penick Village echoed Ms. Tobias' concern. Ms. Tobias further testified Ms. Dillree had "no capacity to participate in a decision" about her placement. In March 2017, two months after Ms. Dillree was removed from the marital home, the trial court found that her "current medical and mental condition requires more care, attention, and safety control than her 80-year-old husband is capable of providing without professional assistance." The guardian *ad litem* report detailed Ms. Dillree's cognitive difficulties. Because Ms. Dillree was deemed incompetent, she could not form the requisite subjective intent to separate from Mr. Dillree for purposes of equitable distribution. *See Moody v. Moody*, 253 N.C. 752, 757, 117 S.E.2d 724, 727 (1961) (holding a husband was not capable of forming the requisite intent to separate for a divorce based on mutual consent because he was "not then rational" after a serious brain injury); *Hall*, 88 N.C. App. at 299, 363 S.E.2d at 191.

¶ 34         It is well settled that general guardians are prohibited from maintaining an action for *divorce* on behalf of an incompetent person based on a year-long separation. *Freeman v. Freeman*, 34 N.C. App. 301, 304, 237 S.E.2d 857, 859 (1977) ("The majority rule that a suit for divorce is so personal and volitional that it cannot be maintained by a guardian on behalf of an incompetent is sound."). Chapter 50 of our

General Statutes has incorporated this general prohibition: "a guardian appointed in accordance with Chapter 35A of the General Statutes . . . may commence, defend, maintain, arbitrate, mediate, or settle any action authorized by this Chapter on behalf of an incompetent spouse. However, only a competent spouse may commence an action for absolute divorce." N.C. Gen. Stat. § 50-22 (2021). Subsection 50-21(a) of Chapter 50 sets forth the general procedures for equitable distribution: "At any time after a husband and wife begin to live separate and apart from each other, a claim for equitable distribution may be filed and adjudicated[.]" However, neither this statute nor any other expressly grants a guardian the power to cause a separation for the purposes of equitable distribution or divorce.

¶ 35        Chapter 35A of our General Statutes provides for incompetency and guardianship. A general guardian is "[a] guardian of both the estate and the person." N.C. Gen. Stat. § 35A-1202(7) (2021). A guardian of the person is "appointed solely for the purpose of performing duties relating to the care, custody, and control of a ward." *Id.* § 35A-1202(10). Section 35A-1241 confers the guardian of the person the power to take custody of the person of the ward and to establish the place of abode of the ward. § 35A-1241(a)(1)-(2). A guardian of the estate, by contrast, is "appointed solely for the purpose of managing the property, estate, and business affairs of a ward." § 35A-1202(9). A general guardian or guardian of the estate has the "power to perform in a reasonable and prudent manner every act that a reasonable and prudent

person would perform incident to the collection, preservation, management, and use of the ward's estate to accomplish the desired result of administering the ward's estate legally and in the ward's best interest," to include: taking possession of the ward's estate; maintaining any appropriate action to recover possession of the ward's property; completing performance of contracts; and continuing any business venture entered into by the ward. § 35A-1251(1),(3),(4),(15).

¶ 36    Interpreting Chapters 50 and 35A to discern a guardian's authority relative to domestic relations law, we are guided by several canons of statutory construction. First, and perhaps most instructive, "[w]hen multiple statutes address a single matter or subject, they must be construed together, *in pari materia*, to determine the legislature's intent. Statutes *in pari materia* must be harmonized, to give effect, if possible, to all provisions without destroying the meaning of the statutes involved." *DTH Media Corp. v. Folt*, 374 N.C. 292, 300, 841 S.E.2d 251, 257 (2020) (citations and quotation marks omitted). While separate chapters of our General Statutes, Sections 50-22 and 35A-1241, 35A-1251 address the same subject matter—the authority of a guardian to act on behalf of an incompetent person—and Section 50-22 explicitly cross-references Chapter 35A. Interpreting Section 50-22 to prohibit a guardian from causing a separation for purposes of equitable distribution does not otherwise limit the guardian's powers under Sections 35A-1241 and 35A-1251 to maintain an action to recover possession of the ward's property. The Legislature did

not provide a mechanism in Chapter 50 for a guardian to seek the incompetent person's assets.

¶ 37     Second, our Legislature is presumed to have full knowledge of prior and existing law. *Polaroid Corp. v. Offerman*, 349 N.C. 290, 303, 507 S.E.2d 284, 294 (1998) *abrogated on other grounds by Lenox, Inc. v. Tolson*, 353 N.C. 659, 548 S.E.2d 513 (2001). Relevant here, at the time it enacted Section 50-22 and the prohibition of a guardian filing for absolute divorce on behalf of an incompetent person, in particular, we presume the General Assembly was aware of our precedents that: (1) an incompetent spouse is not capable of forming the requisite intent to separate for a divorce, *Moody*, 253 N.C. at 757, 117 S.E.2d at 727; (2) the separation requirement for divorce is the same for purposes of equitable distribution, *Hall*, 88 N.C. App. at 299, 363 S.E.2d at 191; (3) separation begins at the time of physical separation where one party has formed the intent for the separation to be permanent, *Bruce*, 79 N.C. App. at 582, 339 S.E.2d at 858; and (4) the trial court does not have subject matter jurisdiction over a claim for equitable distribution if it is filed prior to the date of separation, *Standridge*, 259 N.C. App. at 836, 817 S.E.2d at 465.

¶ 38     Next, "words must be given their common and ordinary meaning, nothing else appearing." *In re Clayton-Marcus Co.,* 286 N.C. 215, 219, 210 S.E.2d 199, 202-03 (1974) (citation omitted). Subsection 35A-1251(3) authorizes a guardian "to *maintain* any appropriate action or proceeding to recover possession of any of the ward's

property, to determine the title thereto, or to recover damages for any injury done to any of the ward's property[.]" (Emphasis added). Chapter 35A does not define the term "maintain" in its definitions section. *See* § 35A-1202 (providing definitions for the Subchapter). Merriam-Webster's Dictionary defines "maintain" as "to keep in an *existing state*," "to preserve," or "to continue." We interpret "maintain" in the context of Subsection 35A-1251(3), alongside Section 50-22, to authorize a guardian to continue an action for equitable distribution only when the claim already exists at the time the guardianship is formed, not after. In other words, pursuant to Section 50-22, a guardian would be authorized to bring an action for equitable distribution on behalf of an incompetent person who had been legally separated prior to incompetency. And a general guardian would be authorized to bring suit for equitable distribution where the other, presumably competent, spouse caused the physical separation with the requisite intent, because subject matter jurisdiction existed prior to the guardianship, so long as the guardian does not allege intent on behalf of the incompetent spouse.

¶ 39        A fourth canon of statutory construction helps us determine whether Chapter 35A or 50 ultimately governs the issue before us. "When two statutes deal with the same subject matter the statute which is addressed to a specific aspect of the subject matter takes precedence over the statute which is general in application unless the General Assembly intended to make the general statute controlling." *In re Greene*,

297 N.C. 305, 310, 255 S.E.2d 142, 146 (1979). Because Section 50-22 applies specifically to divorce and alimony "action[s] on behalf of an incompetent," it "takes precedence over" the general powers granted to guardians under Sections 35A-1251 and 35A-1241. *See id.*

¶ 40 The legislative history of Chapter 50 further bolsters our reading of the statutes that a general guardian lacks the authority to cause marital separation on behalf of an incompetent spouse. Section 50-22 was amended in 2009 to: (1) expand the persons authorized to maintain an action authorized by Chapter 50 to attorneys-in-fact, any guardian appointed under Chapter 35A, and guardians *ad litem*; and (2) remove a provision that the trial court may order equitable distribution on behalf of an incompetent spouse without entering a decree of divorce after the parties have been separated for one year. 2009 N.C. Sess. Laws 366, ch. 224, § 1.

¶ 41 Our interpretation is also consistent with precedent holding that a guardian may not substitute his or her intent for that of an incompetent person as to the disposition of property. *See, e.g., Grant v. Banks*, 270 N.C. 473, 485, 155 S.E.2d 87, 95-96 (1967) (holding a guardian or trustee is without power to rewrite or alter provisions of the will of his ward, such as by commingling funds, so as to destroy the testamentary intent of the testator); *Tighe v. Michal*, 41 N.C. App. 15, 22, 254 S.E.2d 538, 544 (1979) (holding a person ceases to be able to form testamentary intent when a person becomes mentally incompetent).

¶ 42    Plaintiff-Appellee contends that the Legislature could have limited a guardian's ability to pursue equitable distribution or divorce from bed and board pursuant to N.C. Gen. Stat. § 50-7 (2021) on behalf of an incompetent spouse in the same manner it did for absolute divorce pursuant to Section 50-22, had it so intended. But Section 50-7 does not require the intent necessary for absolute divorce and equitable distribution. As a policy matter, she argues adopting Defendants-Appellants' interpretation of the statutes would "render a [g]eneral [g]uardian's right to maintain an equitable distribution action meaningless to protect her ward's estate [under Chapter 35A] if the guardian could not determine whether her ward was separated." Plaintiff-Appellee relies on an unpublished decision from this Court, *In re: Estate of Lisk*, 250 N.C. App. 507, 793 S.E.2d 286 (2016) (unpublished), in which the *trial court* determined a guardian of the person had legal authority to, and did, cause a marital separation on behalf of an incompetent spouse, to further justify Ms. Tobias' action in this case. But the guardian's authority to cause the separation was not challenged on appeal. *Lisk* is neither binding nor persuasive.

¶ 43    As with divorce, the decision to legally separate from one's spouse for equitable distribution, is deeply "personal and volitional," *Freeman*, 34 N.C. App. at 304, 237 S.E.2d at 859. Based on the plain language of the divorce and guardian provisions and considering the legislative history of Section 50-22, we hold a general guardian lacks the authority to cause a legal separation on behalf of an incompetent spouse for

purposes of equitable distribution. Because the guardian could not create a marital separation, Mr. and Ms. Dillree were not legally separated, so the trial court was without subject matter jurisdiction to hear the equitable distribution claim. *See Standridge*, 259 N.C. App. at 836, 817 S.E.2d at 465 ("Where a claim for equitable distribution is filed prior to the date of separation, the trial court does not have subject matter jurisdiction over the claim.") (citing *Atkinson v. Atkinson*, 132 N.C. App. 82, 90, 510 S.E.2d 178, 182 (1999) (J. Greene, dissenting)); N.C. Gen. Stat. § 1A-1, Rule 12(h)(3) (2021) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); § 50-21(a); § 50-20(k). Thus, we reverse the trial court's denial of Defendants-Appellants' motion to dismiss for lack of subject matter jurisdiction and remand for the trial court to dismiss Plaintiff-Appellee's complaint with prejudice.

¶ 44   Our decision shall not be construed to limit, in any way, a guardian's statutory authority to *physically* separate an incompetent person from their spouse where it is in the incompetent person's best interest. *See* § 35A-1241(a)(1)-(2). And, our decision notwithstanding, general guardians are not altogether foreclosed from accessing marital assets on behalf of an incompetent spouse. For example, a guardian may petition the trial court for a constructive trust. *See generally Bowen v. Darden*, 241 N.C. 11, 13-14, 84 S.E.2d 289, 292 (1954) ("[A] constructive trust ordinarily arises out

of the existence of fraud, actual or presumptive—usually involving the violation of a confidential or fiduciary relation—in view of which equity transfers the beneficial title to some person other than the holder of the legal title."). A guardian may also seek a charging order for the distribution of payments for the incompetent person's health care. *See, e.g., McVicker v. McVicker*, 234 N.C. App. 478, 762 S.E.2d 533 (2014) (unpublished) (concluding "a charging order was one, but not the sole, remedy available to plaintiff to enforce the distributive award"). Finally, in the event of spousal abuse, a guardian unequivocally has the authority to take custody of the incompetent person, as Ms. Tobias has done in this case. *See* § 35A-1241(a)(1)-(2).

## III.    CONCLUSION

Based on the foregoing reasons, we reverse the trial court's orders denying Defendants-Appellants' motions to dismiss because the trial court was without subject matter jurisdiction.

REVERSED.

Judges ARROWOOD and CARPENTER concur.